No. 22-12750

# In the United States Court of Appeals for the Eleventh Circuit

———————————————

UNITED STATES OF AMERICA, PLAINTIFF-APPELLEE

*v.*

FRANK BELL, TYSON RHAME,
AND JAMES SHAW, DEFENDANTS-APPELLANTS

———————————————

*ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA (CRIM. NO. 16-67)
(THE HONORABLE STEVE C. JONES, J.)*

———————————————

**BRIEF OF DEFENDANT-APPELLANT FRANK BELL**

———————————————

EMILY A. VANCE
PAUL, WEISS, RIFKIND,
  WHARTON & GARRISON LLP
*1285 Avenue of the Americas*
*New York, NY 10019*

KANNON K. SHANMUGAM
BRIAN M. LIPSHUTZ
YISHAI SCHWARTZ
PAUL, WEISS, RIFKIND,
  WHARTON & GARRISON LLP
*2001 K Street, N.W.*
*Washington, DC 20006*
*(202) 223-7300*
*kshanmugam@paulweiss.com*

*No. 22-12750, USA v. Frank Bell*

## CERTIFICATE OF INTERESTED PERSONS
## AND CORPORATE DISCLOSURE STATEMENT

Pursuant to 11th Cir. R. 26.1-1, Defendant-Appellant Frank Bell provides the following list of interested persons:

- Alston & Bird, LLP, *Counsel for Defendant-Appellant Tyson Rhame*

- Arnall Golden Gregory LLP, *Former Counsel for Defendant-Appellant Frank Bell*

- Bell, Frank, *Defendant-Appellant*

- Borchert, Christopher, *Counsel for Defendant-Appellant Tyson Rhame*

- Brown, Michael L., *Former Counsel for Defendant-Appellant Tyson Rhame*

- Buchanan, Ryan, *United States Attorney*

- Bucholtz, Jeffrey, *Counsel for Defendant-Appellant James Shaw*

- Burby, Raymond J., *Counsel for Defendant-Appellant Tyson Rhame*

- Calli Law LLC, *Counsel for Defendant-Appellant Tyson Rhame*

- Calli, Paul A., *Counsel for Defendant-Appellant Tyson Rhame*

- Cecil, Emma R., *Counsel for Movant Before the District Court*

- Clark Palmer, Amanda R., *Counsel for Defendant-Appellant James Shaw*

- Connors, Kelly K., *Assistant United States Attorney*

- Danzig, Aaron M., *Former Counsel for Defendant-Appellant Frank Bell*

- Ertel, Jeffrey L., *Counsel for Defendant Terrence Keller*

*No. 22-12750, USA v. Frank Bell*

- Federal Defender Program, Inc., *Counsel for Defendant Terrence Keller*

- Finch McCranie, LLP, *Counsel for Movant Before the District Court*

- Garland, Samuel & Loeb, P.C., *Counsel for Defendant-Appellant James Shaw*

- Garland, John A., *Counsel for Defendant-Appellant James Shaw*

- Ghali, Kamal, *Former Assistant United States Attorney*

- Goss, Dahil D., *Assistant United States Attorney*

- Grimberg, Steven D., *Former Assistant United States Attorney*

- Hashimi, Suzanne, *Former Counsel for Defendant Terrence Keller*

- Hawker, Thomas L., *Counsel for Defendant Terrence Keller*

- Jones, Steve C., *United States District Judge*

- Kamaraju, Ankith, *Counsel for Defendant-Appellant Tyson Rhame*

- Kazam, Alexander, *Counsel for Defendant-Appellant James Shaw*

- Keller, Terrence, *Co-Defendant*

- King & Spalding LLP, *Counsel for Defendant-Appellant James Shaw*

- Kramer, Jenny, *Counsel for Defendant-Appellant Tyson Rhame*

- Krepp, Thomas J., *Assistant United States Attorney*

- Liebler, Andrew J., *Counsel for Defendant-Appellant Tyson Rhame*

- Lietz, Warren C., *Counsel for Movant Before the District Court*

- Lilenfeld, David, *Movant Before the District Court*

*No. 22-12750, USA* v. *Frank Bell*

- Lipshutz, Brian M., *Counsel for Defendant-Appellant Frank Bell*

- Lyddan, Samuel M., *Former Counsel for Defendant-Appellant Frank Bell*

- Markus/Moss, PLLC, *Counsel for Defendant-Appellant Tyson Rhame*

- Markus, David O., *Counsel for Defendant-Appellant Tyson Rhame*

- Markus, Mona E., *Counsel for Defendant-Appellant Tyson Rhame*

- McClain, Stephen H., *Assistant United States Attorney*

- Mezzina, Paul Alessio, *Counsel for Defendant-Appellant James Shaw*

- Mickelson, Jamie L., *Assistant United States Attorney*

- Paul, Weiss, Rifkind, Wharton & Garrison LLP, *Counsel for Defendant-Appellant Frank Bell*

- Prout, Alison B., *Assistant United States Attorney*

- Rhame, Tyson, *Co-Defendant-Appellant*

- Samuel, Donald F., *Counsel for Defendant-Appellant James Shaw*

- Salinas, Catherine M., *United States Magistrate Judge*

- Sandoval, Andres H., *Assistant United States Attorney*

- Schwartz, Yishai, *Counsel for Defendant-Appellant Frank Bell*

- Shanmugam, Kannon K., *Counsel for Defendant-Appellant Frank Bell*

- Shaw, James, *Co-Defendant-Appellant*

- Short, Charles P., *Counsel for Defendant-Appellant Tyson Rhame*

- Sterling Currency Group, LLC (f/k/a Dinar Banker)

*No. 22-12750, USA* v. *Frank Bell*

- Sullivan, Sean, *Former Counsel for Defendant-Appellant Frank Bell*

- Vance, Emily A., *Counsel for Defendant-Appellant Frank Bell*

Counsel for defendant-appellant Frank Bell certifies that no publicly traded company or corporation has an interest in the outcome of this appeal.

## STATEMENT REGARDING ORAL ARGUMENT

Appellant Frank Bell respectfully submits that oral argument would be useful to the disposition of this case because it presents important issues regarding the interpretation and application of several federal statutes.

# TABLE OF CONTENTS

Page

Statement regarding adoption of briefs of other parties ...................................1

Statement of subject-matter and appellate jurisdiction ...................................1

Statement of the issues ...................................2

Statement of the case ...................................2

    A.    Background...................................4

    B.    Proceedings below...................................12

    C.    Standard of review ...................................19

Summary of argument ...................................19

Argument...................................25

    I.    The government did not prove, and the district court did not properly instruct the jury concerning, intent to deprive another of money or property...................................26

        A.    'Intent to defraud' requires an intent to deprive another of money or property ...................................26

        B.    The evidence presented was insufficient to prove an intent to deprive anyone of money or property ...................................31

        C.    In the alternative, the district court erred by failing correctly to define 'intent to defraud' in its jury instructions ...................................36

Page

Table of contents—continued:

    II.    The government failed to present sufficient evidence of a false statement ................................................................39

        A.    Mr. Bell's statements were too ambiguous to support a conviction ......................................................40

        B.    In the alternative, the government's failure to introduce sufficient evidence of falsity requires reversal..................................................................48

    III.    The district court abused its discretion by admitting a highly prejudicial video about a different case ............................50

Conclusion.......................................................................53

Certificate of compliance

Statutory addendum

# TABLE OF CITATIONS

## CASES

*Bronston* v. *United States*, 409 U.S. 352 (1973) ...................................................41

*Cleveland* v. *United States*, 531 U.S. 12 (2000) ....................................................27

*Kelly* v. *United States*, 140 S. Ct. 1565 (2020) ....................................................27

*McNally* v. *United States*, 483 U.S. 350 (1987)....................................................27

*Morgan* v. *State*, 42 Ark. 131 (1883) ...................................................................30

*Neder* v. *United States*, 527 U.S. 1 (1999)............................................................37

*Old Chief* v. *United States*, 519 U.S. 172 (1997) ...........................................50, 51

*Pope* v. *Illinois*, 481 U.S. 497 (1987)....................................................................37

* *Shaw* v. *United States*, 580 U.S. 63 (2016)...........................................26, 27, 36

*Skilling* v. *United States*, 561 U.S. 358 (2010)......................................................27

*Stockman* v. *Oakcrest Dental Center, P.C.*,
   480 F.3d 791 (6th Cir. 2007)...........................................................................51

*United States* v. *Boffil-Rivera*, 607 F.3d 736 (11th Cir. 2010)..........................48

*United States* v. *Calhoon*, 97 F.3d 518 (11th Cir. 1996),
   *cert. denied*, 522 U.S. 806 (1997) ..................................................................39

*United States* v. *Diogo*, 320 F.2d 898 (2d Cir. 1963) ..........................................47

*United States* v. *Dohan*, 508 F.3d 989 (11th Cir. 2007),
   *cert. denied*, 553 U.S. 1034 (2008) ...........................................................19, 39

Page

Cases—continued:

*United States* v. *Elysee*, 993 F.3d 1309 (11th Cir. 2021),

    *cert. denied*, 142 S. Ct. 2782 (2022) ................................................51

*United States* v. *Evans*, 892 F.3d 692 (5th Cir. 2018)........................................30

*United States* v. *Hirsch*, 360 F.3d 860 (8th Cir. 2004)......................................47

\* *United States* v. *Manapat*, 928 F.2d 1097 (11th Cir. 1991)..........40, 41, 46, 47

*United States* v. *Marshall*, 173 F.3d 1312 (11th Cir. 1999)..............................19

*United States* v. *Mayweather*, 991 F.3d 1163 (11th Cir. 2021)........................37

*United States* v. *Miller*, 953 F.3d 1095 (9th Cir. 2020),

    *cert. denied*, 141 S. Ct. 1085 (2021) ................................................30

*United States* v. *Novak*, 443 F.3d 150 (2d Cir.),

    *cert. denied*, 549 U.S. 997 (2006) ..................................................29

*United States* v. *Prather*, 205 F.3d 1265 (11th Cir.),

    *cert. denied*, 531 U.S. 879 (2000) ..................................................19

*United States* v. *Rahman*, 805 F.3d 822 (7th Cir. 2015) ............................47, 48

*United States* v. *Ratcliff*, 488 F.3d 639 (5th Cir. 2007)....................................30

*United States* v. *Regent Office Supply Co.*,

    421 F.2d 1174 (2d Cir. 1970) ........................................................29

*United States* v. *Ryan*, 828 F.2d 1010 (3d Cir. 1987)........................................41

Page

Cases—continued:

*United States* v. *Sammour*, 816 F.3d 1328 (11th Cir.),

    *cert. denied*, 137 S. Ct. 177 (2016) ...................................................19

*United States* v. *Shellef*, 507 F.3d 82 (2d Cir. 2007)............................................29

*United States* v. *Starr*, 816 F.2d 94 (2d Cir. 1987)..............................................29

*United States* v. *Svete*, 556 F.3d 1157 (11th Cir. 2009),

    *cert. denied*, 559 U.S. 1009 (2010) .................................................30

*United States* v. *Swindall*, 971 F.2d 1531 (11th Cir. 1992),

    *cert. denied*, 510 U.S. 1040 (1994) .................................................41

\* *United States* v. *Takhalov*, 827 F.3d 1307,

    *modified on denial of reh'g*, 838 F.3d 1168 (11th Cir. 2016)...............*passim*

*United States* v. *Watkins*, 42 F.4th 1278 (11th Cir. 2022)...........................35, 36

*United States* v. *Wheeler*, 16 F.4th 805 (11th Cir. 2021),

    *cert. denied*, 142 S. Ct. 2794 (2022) ................................................35

\* *United States* v. *White*, 765 F.2d 1469 (11th Cir. 1985) .................................48

*United States* v. *Yermian*, 468 U.S. 63 (1984)....................................................27

## STATUTES AND RULES

18 U.S.C. § 1001 ........................................................................*passim*

18 U.S.C. § 1341 ........................................................................12, 26

18 U.S.C. § 1343 ........................................................................12, 26

Page

Statutes and rules—continued:

18 U.S.C. § 1349 ................................................................................12

18 U.S.C. § 1956 ................................................................................12

18 U.S.C. § 1957 ................................................................................12

18 U.S.C. § 3231 ..................................................................................1

28 U.S.C. § 1291 ..................................................................................1

Fed. R. App. P. 28(i) ............................................................................1

Fed. R. Evid. 403................................................................4, 24, 50

11th Cir. R. 28-1(f) ..............................................................................1

## OTHER AUTHORITIES

Joel Prentiss Bishop, *Commentaries on the Criminal Law* (1858) ................30

Eleventh Circuit Pattern Jury Instructions, Criminal Cases

 O50.1 (2019 rev.) <tinyurl.com/11cirjuryinstr>....................................18, 36

Francis Wharton, *A Treatise on the Criminal Law of the United*

 *States* (7th ed. 1874)..........................................................................31

## STATEMENT REGARDING ADOPTION
## OF BRIEFS OF OTHER PARTIES

Pursuant to Federal Rule of Appellate Procedure 28(i) and 11th Circuit Rule 28-1(f), appellant Frank Bell adopts and joins in the arguments made by appellants Tyson Rhame and James Shaw, including their arguments that (1) the government's failure to introduce sufficient evidence to support the convictions requires acquittal and (2) the district court's failure to exclude a blog post, article, and document that were hearsay and unfairly prejudicial requires a new trial.

## STATEMENT OF SUBJECT-MATTER
## AND APPELLATE JURISDICTION

The district court had jurisdiction under 18 U.S.C. § 3231. The district court imposed sentence on December 10, 2021, *see* Doc. 764, at 2, and entered final judgment on August 10, 2022, *see* Doc. 802, at 1-2.[*] Mr. Bell filed a timely notice of appeal on August 11, 2022. *See* Doc. 807, at 1. The jurisdiction of this Court rests on 28 U.S.C. § 1291.

---

[*] District court docket entries are cited by document number and page number. Where trial exhibits are not on the docket, they are cited as "Def. Ex. __" for exhibits introduced by Mr. Bell, Mr. Rhame, or Mr. Shaw; "Keller Ex. __" for exhibits introduced by defendant Terrence Keller; or "Gov't Ex. __" for exhibits introduced by the government.

(1)

## STATEMENT OF THE ISSUES

1.     a.     Whether the government failed to present sufficient evidence of intent to defraud.

b.     Whether the district court erred by failing to instruct the jury that "intent to defraud" requires intent to deprive another of money or property.

2.     a.     Whether appellant's alleged misstatements to law enforcement were fundamentally ambiguous and thus insufficient to support a conviction.

b.     Whether the government failed to present sufficient evidence that the alleged misstatements were false.

3.     Whether the district court abused its discretion in admitting a highly prejudicial video concerning an unrelated case.

## STATEMENT OF THE CASE

Sterling Currency Group was a currency-exchange business that bought and sold Iraqi dinars at agreed-upon prices. Sterling was owned by defendant-appellants Tyson Rhame and James Shaw; defendant-appellant Frank Bell joined the company after several years and eventually became chief operating officer. The value of the dinar was at all times set by the Iraqi government, but some of Sterling's customers hoped that the government would revaluate the dinar and significantly increase its value. Some of Sterling's customers also visited an online forum where defendant Terrence Keller shared information and rumors about the dinar. Sterling purchased advertisements on the

forum and its conference calls for a flat fee, as did other currency brokers. Mr. Bell indisputably never made any representations about the likelihood of a revaluation.

The government nevertheless charged Mr. Bell, Mr. Rhame, Mr. Shaw, and Mr. Keller with conspiracy to defraud Sterling's customers and several other offenses. Mr. Bell now appeals his convictions for mail and wire fraud, conspiracy to commit mail and wire fraud, and making false statements to federal agents. This Court granted release pending appeal, and it should now reverse or vacate Mr. Bell's convictions.

*First*, Mr. Bell's convictions for fraud and conspiracy should be reversed because the government failed to adduce sufficient evidence of an intent to deprive another of money or property. To sustain a conviction for mail and wire fraud, the government must prove that the defendant intended *both* to deceive *and* to deprive another of money or property. The government cannot show the latter intent where customers received precisely the goods they paid for at precisely the price they agreed to pay. Because that is the case here, the evidence was insufficient to convict Mr. Bell of mail fraud, wire fraud, and conspiracy. At the very least, the Court should vacate the convictions and remand for a new trial, because the jury instructions failed to require a determination that Mr. Bell had the requisite intent to deprive another of money or property.

*Second*, the government failed to prove that Mr. Bell made a materially false or misleading statement to federal agents. Mr. Bell's comments about Sterling's relationship with dinar promoters should not have been submitted to the jury because they were fundamentally ambiguous. The agents never sought to clarify what Mr. Bell meant by a "firewall" between Sterling and dinar promoters, and they never sought to clarify what he meant by telling promoters not to "direct" or "drive" business to Sterling. Above all, they did not clarify how those statements related to the legitimate advertising relationship that Mr. Bell had already disclosed. And even if those statements were not fundamentally ambiguous, both convictions should be reversed for the independent reason that the government failed to negate all reasonable interpretations that would have made the statements factually correct.

*Third*, all of Mr. Bell's convictions should be vacated because the jury was permitted to view a highly prejudicial CNBC segment covering the trial of Brad Huebner, a different dinar seller. The district court abused its discretion by concluding that the unfair prejudice from the video did not substantially outweigh any probative value under Federal Rule of Evidence 403. The judgment of the district court should be reversed or vacated.

## A.    Background

1.    Sterling Currency Group, formerly known as Dinar Banker, bought and sold Iraqi dinars and other currencies from 2004 until 2015. *See*

Doc. 528-2, at 71, 106; Doc. 534, at 51, 53; Doc. 541, at 8. The purchase and sale of Iraqi dinars was and is lawful under United States law. *See* Doc. 528-2, at 79. Banks and other companies sold and purchased Iraqi dinars during that period as well. *See, e.g.*, Doc. 527, at 21-22; Doc. 532, at 129-130; Doc. 532-1, at 27; Doc. 534, at 56-58; Doc. 541, at 7, 40.

Mr. Rhame and Mr. Shaw founded Sterling, which they initially operated out of their homes. *See* Doc. 531-2, at 38. Sterling offered customers the ability to purchase dinars outright, and it later added a layaway option. *See* Doc. 527-1, at 17; Doc. 534, at 76-77. Customers who purchased dinars outright received physical currency. *See* Doc. 532-1, at 28; Doc. 540-1, at 35; Doc. 542-1, at 44. Customers who used the layaway program paid an initial deposit equal to a percentage of their total purchase and had the option to receive the physical dinars by paying the balance within a specified timeframe. *See* Doc. 528, at 19-21; Doc. 542-1, at 44. The program evolved over time, with Sterling offering non-guaranteed layaway programs (in which customers would forfeit their deposit if they did not complete their purchase within the specified timeframe) and guaranteed layaway programs (in which customers would receive the value of their deposit in dinars, regardless of whether they paid the balance within the specified timeframe). *See, e.g.*, Doc. 528, at 19-21; Doc. 540-2, at 44-45, 75-77; Doc. 541, at 37-38, 72-74; Doc. 542-1, at 44-45. Customers

could also sell dinars back to Sterling.  *See* Doc. 525-1, at 49; Doc. 528, at 81; Doc. 528-2, at 71; Doc. 543-2, at 18, 90.

In 2010, Sterling first hired Mr. Bell as a part-time employee.  *See* Gov't Ex. 52-1, at 7-8.  Sterling made him a full-time employee in January 2011, and by 2013 he was responsible for Sterling's day-to-day operations as chief operating officer.  *See id*. at 8-10.  Mr. Bell became known as Sterling's "compliance guy," Doc. 530-2, at 60, because legal compliance was his "number one priority," Doc. 543-2, at 94-95.  He hired lawyers and consultants, and trained employees to improve Sterling's practices and to ensure that the company adhered to all laws and regulations.  *See* Doc. 528-2, at 79-86, 99-100, 103; Doc. 530-2, at 60-61.  He also encouraged employees to be transparent.  Doc. 543-2, at 29.  He even had compliance consultants call Sterling employees to test their adherence to company policies.  Gov't Ex. 52-1, at 15.

As is most relevant here, Mr. Bell instituted a rule prohibiting Sterling employees from giving customers investment advice.  *See* Doc. 528-2, at 82-83, 87-89, 106, 128-129; Def. Ex. 520; Def. Ex. 556, at 3.  That rule was reflected in a disclaimer on Sterling's website under the heading "**Important**," which informed layaway customers in pertinent part:

> Customers absolutely should NOT be buying [dinars] as a 'gamble' on a rapid increase in value of the Iraqi Dinar. . . .  No one knows when or if a change in value in the Iraqi Dinar is going to occur.  We strongly advise customers to conduct their own research on the Iraqi Dinar before making a purchase.  We advise

> potential Iraqi Dinar purchasers to be weary [*sic*] of salacious ru-
> mors or hype that may be presented on the internet.

Def. Ex. 556, at 3; *see also* Doc. 525-1, at 64.  Customers making purchases
were required to affirm that they had read the disclosure.  *See* Def. Ex. 556, at
3; Doc. 525-1, at 64.

2.    Three months before Mr. Bell began working for Sterling, Mr.
Keller approached Sterling to invite a representative to appear on one of his
Internet forum's conference calls.  *See* Doc. 526, at 123-124; Gov't Ex. 290.  Mr.
Keller's forum, known as the GET Team, hosted public conference calls and
chatrooms where participants discussed the Iraqi economy and currency.  *See*
Doc. 527-1, at 22; Doc. 527-2, at 104-107.  The GET Team website contained a
disclaimer that the information being provided was not offered by investment
professionals.  *See* Keller Ex. 400; Doc. 525-1, at 53, 86-87; Doc. 527-2, at 44-
45; Doc. 534-2, at 146-148.  The calls and chatrooms were instead presented as
an opportunity for "social gathering, caring, [and] friendship."  Doc. 525-1, at
86-87; *see also id.* at 53; Keller Ex. 400.  Like many GET Team participants,
Mr. Keller held dinars.  *See* Doc. 530, at 78-83; Doc. 545, at 82.

On the calls and in the chats, Mr. Keller shared what he and others char-
acterized as "rumors" concerning the likelihood of a revaluation.  *See*, *e.g.*, Doc.
527-2, at 29-41, 106-107; Doc. 534-2, at 108; Keller Exs. 501, 503, 505, 508, 511,
512, 513.  He frequently stated that a revaluation was "happening tonight" or

"tomorrow" based on information from unidentified sources, and he told listeners to "be ready." Doc. 540-1, at 9-10. Although the GET Team routinely touted its belief that a revaluation was imminent (and at times even said that a revaluation had already occurred), that prediction and the GET Team's "sources" never proved to be correct, as Mr. Keller acknowledged to listeners. *See*, *e.g.*, Doc. 527-2, at 41-43, 49.

When Mr. Keller approached Sterling about advertising with the GET Team, another dinar broker, Dinar Trade, had already been advertising on the forum. *See* Doc. 534-2, at 64-65. Under that arrangement, Mr. Keller placed a banner ad for Dinar Trade on the GET Team website and invited Dinar Trade employees to provide an infomercial about their company and its services on GET Team calls. *See id.* at 58, 64.

Sterling and Mr. Keller ultimately entered into a similar relationship. In exchange for a fixed fee of $4,000 each month, Mr. Keller placed a banner advertisement for Sterling on the GET Team website and invited Sterling to join the conference calls as a "sponsor" to answer questions about the company and give a short commercial. *See* Gov't Ex. 52-1, at 20; Def. Ex. 406; Doc. 528-2, at 130; Doc. 540-1, at 46. The substance of the GET Team calls was the same before and after Sterling began advertising. *See* Doc. 527-2, at 106-107; Doc. 528-2, at 66, 90, 129. Mr. Keller treated both brokers equally, placing a banner ad for each one on the GET Team website and providing promotional codes

8

that would enable purchasers to obtain the same discount from either broker. *See* Doc. 531-2, at 107-109.

In addition, Mr. Keller entered into an advertising relationship with another dinar broker named Dinar Inc. *See* Doc. 530, at 24. As he did with Dinar Trade, Mr. Keller treated Sterling and Dinar Inc. equally, allowing both to speak for the same amount of time on GET Team calls. *See id.*; Keller Exs. 501, 503, 505, 508, 511, 512, 513; Doc. 527-2, at 30-35. Although Mr. Keller privately expressed a preference for Sterling at times, he never told GET Team participants to buy dinars from only one broker. Doc. 527-2, at 30-35. He instead referred to both companies as "sponsors" of the GET Team website and told listeners that they should "equally" support both companies. Doc. 528-2, at 90-91.

After Mr. Bell was hired by Sterling, he periodically joined public GET Team conference calls and encouraged customers who were interested in buying dinars to patronize Sterling. *See* Doc. 533-2, at 64, 73; *see also* Doc. 528-2, at 128-129. Mr. Bell never commented on the likelihood of a revaluation and affirmatively instructed listeners to "do your research" and "[d]o a lot of it" before buying dinars. *See* Doc. 525-1, at 57; Doc. 527-2, at 108-109; Doc. 533-2, at 73; Gov't Ex. 52-1, at 30. Despite introducing a great deal of evidence

concerning Mr. Keller's statements about the dinar and the likelihood of re-valuation, the government introduced no evidence that Mr. Bell, Mr. Rhame, or Mr. Shaw told him what to say. *See* Doc. 533-1, at 66-67.

3.    On its own website, Sterling stated that it "ha[d] the ability" to set up exchanges at "numerous airport locations nationwide" to allow customers and non-customers alike to exchange their dinars for dollars. Gov't Ex. 825, at 2. The plans for such a program were discussed at meetings of Sterling's managers, including its compliance manager. *See* Doc. 543-2, at 119-120. Sterling's employees were aware of those plans, including the fact that, as licensed pilots, Mr. Rhame and Mr. Bell had the ability to rent conference rooms at or near airports. *See* Doc. 530-2, at 45-46; Doc. 541, at 48-49.

Before Mr. Bell joined Sterling, the website stated that airport exchanges would be available within 24 hours of a revaluation. *See* Gov't Ex. 825, at 2. After Mr. Bell joined the company, Sterling deleted any reference to a fixed timeframe, instead stating that Sterling would come to a city with an airport served by at least two major carriers when holders of currency had at least $5 million worth of dinars to exchange. *See* Doc. 528-2, at 69-70; Doc. 530-1, at 34-35; Doc. 533-2, at 48-52, 57. Mr. Bell took pains to make clear that the exchanges would not be set up in 24 hours and that it would take time to "hire, train people and get them in place." Gov't Ex. 657(b), at 9-10; *see also* Doc. 533-2, at 51-52; Gov't Ex. 139. He told at least one customer that it could take

10

ten days or more "if we have high demand." Doc. 533-2, at 51-52; Gov't Ex. 139.

4.    On May 28, 2015, Special Agents Scott Baucom and Stephen Ryskoski from the Federal Bureau of Investigation (FBI) met with Mr. Bell in Sterling's offices. They did not disclose that the FBI was investigating Sterling. Rather, Mr. Bell had contacted the FBI to discuss his concern that a competitor was engaging in illegal activity. *See* Doc. 533-1, at 38-39; Doc. 533-2, at 90-91; Gov't Ex. 50-1, at 7-9. The meeting was informal and covered a variety of topics, including Mr. Bell's background, Sterling's compliance policies, his knowledge of other dinar brokers' misconduct, and the dinar-brokerage business in general. *See* Gov't Ex. 50-1, at 5-22. Mr. Bell explained that there were "a bunch of guys out there hyping" dinars and that Sterling "might put a banner ad on their site." *Id.* at 9-10. But Mr. Bell also stated that Sterling "maintain[ed] a firewall between us and those guys" and that he had told the dinar promoters that "[their] job is not to drive business to [Sterling's] website." *Id.* at 10. Neither agent clarified Mr. Bell's statement.

On June 3, 2015, FBI agents unexpectedly raided Mr. Bell's home. *See* Gov't Ex. 52-1, at 2. Mr. Bell agreed to speak with Special Agents Baucom and Jason Cleary, who characterized the meeting as an opportunity to clear up questions and misunderstandings. *See id.* at 2-3. Topics included the circumstances of Mr. Bell's joining Sterling, Sterling's relationship with the GET

11

Team, Sterling's business more generally, and Mr. Bell's personal holdings of $5,000 worth of dinars. *See id.* at 3-40. On the subject of Sterling's relationship with the GET Team, Mr. Bell explained that Sterling paid a flat monthly fee to advertise on the GET Team's website and provide a short weekly infomercial on conference calls. *See id.* at 16. When one of the FBI agents asked about communications from dinar promoters "about kind of what they're doing in these chat rooms to direct business to Sterling," Mr. Bell answered that he told Mr. Keller, "I don't want him doing it and I don't want to hear about it." *Id.* at 18-19. Once again, neither agent clarified the meaning of that statement.

### B.  Proceedings Below

1. On February 10, 2016, a grand jury in the Northern District of Georgia indicted Mr. Bell, Mr. Rhame, Mr. Shaw, and Mr. Keller. *See* Doc. 1, at 1-10. A superseding indictment charged all four defendants with mail and wire fraud and conspiracy to commit mail and wire fraud. *See* Doc. 178, at 1-12; *see also* 18 U.S.C. §§ 1341, 1343, 1349. Mr. Bell and Mr. Rhame were also indicted for making false statements to FBI agents, in violation of 18 U.S.C. § 1001. *See* Doc. 178, at 16-20. Mr. Rhame and Mr. Shaw were further indicted for money laundering, and they and Mr. Bell were indicted for conspiracy to launder money. *See* Doc. 178, at 12-15; *see* 18 U.S.C. §§ 1956, 1957. The government later dismissed twenty of the counts, including three mail-fraud counts and seven wire-fraud counts against Mr. Bell. *See* Doc. 541-2, at 25.

The government claimed that Mr. Keller deceived listeners by telling them that he had inside information regarding an imminent revaluation. *See* Doc. 178, at 5. The government also claimed that Mr. Bell, Mr. Rhame, and Mr. Shaw were responsible for those statements despite the absence of any evidence that they directed Mr. Keller's comments. *See* Doc. 527-2, at 104, 106-107; Doc. 533-1, at 66. The government argued that, simply by paying Mr. Keller a flat advertising fee without revealing to customers that they did so, Mr. Bell, Mr. Rhame, and Mr. Shaw deceived customers, *see* Doc. 178, at 4-9, despite the evidence that Sterling's relationship with the GET Team was obvious from the GET Team's website and conference calls, *see*, *e.g.*, Doc. 525, at 74-75; Doc. 525-1, at 58-60; Doc. 532-1, at 16; Doc. 541, at 27. The government further asserted that Mr. Bell, Mr. Rhame, and Mr. Shaw deceived customers by representing that Sterling would open exchanges at or near airports when Sterling never intended to follow through on that representation. *See* Doc. 178, at 4-9.

As to the false-statement charges, the government alleged that Mr. Bell lied during his two interviews with FBI agents. *See* Doc. 178, at 19-20. The government argued that, in the first interview, Mr. Bell falsely stated that Sterling maintained a "firewall" with unnamed dinar promoters and that he told promoters not to "drive business" to Sterling. *See* Gov't Ex. 50-1, at 10. The government also argued that, during the second interview, Mr. Bell made

a false statement when an agent asked "about kind of what they're doing in these chat rooms to direct business to Sterling" and Mr. Bell answered that he told Mr. Keller, "I don't want him doing it."  Gov't Ex. 52-1, at 18-19.

2.    Mr. Bell, Mr. Rhame, and Mr. Shaw moved to dismiss the indictment.  *See* Doc. 220.  They explained that, because Sterling's customers received exactly what they paid for at the present, fair-market value, the indictment failed to allege intent to harm under this Court's then-recent decision in *United States* v. *Takhalov*, 827 F.3d 1307, *modified on denial of reh'g*, 838 F.3d 1168 (11th Cir. 2016).  *See* Doc. 220, at 11-20.  The magistrate judge issued a report and recommendation denying the motion, which the district court adopted.  *See* Doc. 245, at 1-21; Doc. 264, at 26.

3.    The case proceeded to trial.  With respect to the wire-fraud and mail-fraud counts, the government contended that there were three categories of false representations during Mr. Bell's time with Sterling.  *First*, it argued that Mr. Keller misrepresented the likelihood of an imminent revaluation on GET Team conference calls and in GET Team chatrooms.  *See*, *e.g.*, Gov't Resp. to Mots. for Continued Release Pending Appeal ("Gov't Resp.") 4-5.  *Second*, the government argued that Sterling somehow concealed that it paid for advertisements on the GET Team website and conference calls.  *See*, *e.g.*, *id*. at 6.  *Third*, the government argued that Sterling falsely represented that

it planned to open exchanges in certain cities when it had no intention of doing so. *See, e.g., id.* at 5.

The government failed to introduce any evidence of a misrepresentation concerning the characteristics or value of the dinar that customers purchased. To the contrary, the evidence showed that the value of the dinar purchased did not depend on any representations by Sterling or the GET Team, but was instead dependent on the exchange rate set by the Iraqi government. *See, e.g.,* Doc. 528-2, at 147; Doc. 540, at 66-67. As the government conceded, customers "got the dinar [they] paid for." Doc. 545, at 32.

With respect to the false-statement counts, the government failed to establish the meaning of Mr. Bell's statements to FBI agents about the "firewall" with third-party promoters and his request that they not "drive" or "direct" business to Sterling. Agent Ryskoski could not explain what Mr. Bell meant by any of his allegedly false statements. Agent Ryskoski conceded that none of the dictionary definitions of "firewall" applied and that "some people may have different interpretations" of that term. Doc. 534, at 47. He also acknowledged that he did not ask Mr. Bell to clarify how "driv[ing]" or "direct[ing]" business differed from the advertising relationship that Mr. Bell had previously discussed. *See id.* And Agent Ryskoski admitted that "driv[ing] business" must have meant something other than advertising because Mr. Bell had disclosed the advertising relationship with the GET Team. *See id.* at 48.

15

The government presented no evidence that Agent Ryskoski or any other agent tried to clarify what Mr. Bell meant.

The government did introduce an inflammatory video from CNBC's coverage of the conviction of Brad Huebner, a different dinar seller. *See* Gov't Ex. 709(a). The government argued that Mr. Bell was on notice that Sterling's business was illegal because the video had been e-mailed to him in 2015, although the only evidence that he actually watched it was his ambiguous response to the sender. *See* Gov't Ex. 709. Either way, the video was a sensational report with the chyrons "CRIME & PUNISHMENT" and "IRAQI DINAR SCAM." *See* Gov't Ex. 709(a). The facts about Mr. Huebner's business were superficially similar to Sterling's business, including dinar sales, conference calls, and veterans of the Iraq war. *See id.* But Mr. Huebner ran a separate business, and his conduct was significantly different. Unlike Sterling, Mr. Huebner and his partners hosted conference calls; predicted that the revaluation was likely; lied about setting up hedge funds; and misrepresented one partner's financial expertise and service in Iraq. *See id.*

The district court denied Mr. Bell, Mr. Rhame, and Mr. Shaw's motion to preclude admission of the video and motion for a mistrial. *See* Doc. 330, at 2, 15; Doc. 415, at 3; Doc. 528-1, at 39-42; Doc. 528-2, at 4. The court granted only their alternative request for a limiting instruction, which provided that the jury could not "consider the fact that someone else in another case was

charged or convicted of another crime in deciding whether anybody in this case should be found guilty"; that "[t]here's no evidence that the news station reported the case accurate[ly]"; and that the jury "may only consider [the video] as to notice as to Frank Bell." Doc. 528-2, at 27-28.

4.      After the close of evidence, Mr. Bell and his codefendants requested jury instructions that would have required the jury to determine whether they intended to deceive customers *and* deprive them of money or property. *See* Doc. 427, at 23. Defendants proposed an instruction that "[p]roving intent to deceive alone, meaning deception without the intent to cause loss or injury, is not sufficient to prove intent to defraud." *Id.* The proposed instruction further clarified that the jury must find that defendants did not "g[i]ve the person exactly what they asked for" or "charge[] that person exactly what he or she agreed to pay." *Id.* During the charge conference, defendants argued that the substance of their proposed instruction was required by this Court's decision in *Takhalov. See* Doc. 544, at 105-118, 143-147, 157.

The district court rejected defendants' proposal and instructed the jury that "[t]o act with 'intent to defraud' means to act knowingly and with the specific intent to deceive *or* cheat someone, *usually* for personal financial gain *or* to cause financial loss to someone." Doc. 510, at 23 (emphasis added). The

district court at no point clarified that defendants must have intended to deprive others of money or property.

The district court did instruct the jury that Mr. Bell, Mr. Rhame, and Mr. Shaw's "theory of defense" was that "Sterling sold authentic currency and customers who bought from Sterling received what they paid for." Doc. 510, at 3. In so doing, the district court emphasized to the jury that the "theory of defense" instruction was not a statement regarding the legal elements of the offenses charged, but rather "defendants' way of telling [the jury] their positions on what they believe the facts showed in this case." Doc. 546, at 21.

5.  On October 9, 2018, Mr. Bell, Mr. Rhame, and Mr. Shaw were convicted of all remaining counts except the money-laundering charges, and Mr. Keller was acquitted of all charges. *See* Docs. 516-519. Mr. Bell moved for a judgment of acquittal or a new trial, arguing in relevant part that the government failed to prove intent to harm; that the jury instruction on that issue was inadequate; and that the alleged false statements were fundamentally ambiguous. *See* Docs. 559, 566. While those motions were pending, the Judicial Council for the Eleventh Circuit amended its pattern jury instructions to add language that is nearly identical to language that defendants requested: "Proving intent to deceive alone, without the intent to cause loss or injury, is not sufficient to prove intent to defraud." *See* Eleventh Circuit Pattern Jury Instructions, Criminal Cases O50.1 (2019 rev.) <tinyurl.com/11cirjuryinstr>.

The district court acknowledged "some concerns about not charging that particular charge," Doc. 623, at 23, but nonetheless denied Mr. Bell's motions, *see* Docs. 678, 681. The court sentenced Mr. Bell to 84 months of imprisonment. *See* Doc. 764. This Court granted Mr. Bell release pending appeal.

## C.     Standard Of Review

This Court reviews the sufficiency of the evidence de novo, determining whether a rational jury could find the essential elements of the crime beyond a reasonable doubt. *See*, *e.g.*, *United States* v. *Sammour*, 816 F.3d 1328, 1335-1336 (11th Cir.), *cert. denied*, 137 S. Ct. 177 (2016). This Court also "review[s] the legal correctness of a jury instruction de novo." *United States* v. *Prather*, 205 F.3d 1265, 1270 (11th Cir.), *cert. denied*, 531 U.S. 879 (2000). If the instructions given by the district court correctly stated the law, this Court reviews the failure to give a requested instruction for abuse of discretion. *See*, *e.g.*, *United States* v. *Dohan*, 508 F.3d 989, 993 (11th Cir. 2007) (citation omitted), *cert. denied*, 553 U.S. 1034 (2008). This Court reviews a district court's evidentiary rulings for an abuse of discretion. *See United States* v. *Marshall*, 173 F.3d 1312, 1314 n.3 (11th Cir. 1999).

## SUMMARY OF ARGUMENT

Mr. Bell was convicted of conduct that does not constitute a crime under the federal fraud statutes. In addition, his allegedly false statements were too ambiguous to form the basis of a conviction under Section 1001. All of Mr.

19

Bell's convictions should therefore be reversed.  But at a minimum, Mr. Bell's convictions should be vacated because the district court abused its discretion in admitting the video from CNBC's coverage of the trial of Brad Huebner.

I.    The government did not prove, and the district court did not instruct the jury that it was obligated to find, that Mr. Bell intended to harm Sterling's customers by depriving them of money or property.

A.    The mail- and wire-fraud statutes both require the government to prove not only an intent to deceive, but also an intent to harm by depriving another of money or property.  A misrepresentation that simply influences another party's decision to transact is not a scheme to defraud unless the misrepresentation concerns the substance of the bargain—that is, the price or characteristics of the good being sold.  As this Court and others have held, there is no fraud when customers receive precisely what they purchased.

B.    That principle compels reversal of Mr. Bell's convictions for mail fraud, wire fraud, and conspiracy to commit mail and wire fraud.  The government produced no evidence that the defendants misrepresented the price or characteristics of the dinars they sold during Mr. Bell's time with Sterling. The government argued that Mr. Keller's statements about a likely revaluation; the alleged failure to disclose the details of the financial relationship between Sterling and Mr. Keller; and Mr. Bell's statements about exchanges at or near airports were part of the essence of the bargain.  But each of those

20

alleged misrepresentations was collateral to the actual bargain, and none involved the present value of the dinar, which was determined by the Iraqi government and unaffected by speculation. *First*, regardless of Mr. Keller's statements, Sterling made clear that it sold dinars, not an investment with expected profits. *Second*, any representations about the financial relationship between Sterling and Mr. Keller are distinct from the bargain between Sterling and the purchasers, as this Court has recognized in a case involving nearly identical facts. *Third*, the exchanges were available to the general public and not part of the services that Sterling's customers purchased. And in any event, the evidence at trial did not show that Mr. Bell misrepresented Sterling's capability or willingness to set up the exchanges. The government thus failed to prove that Mr. Bell intended to deprive customers of money or property.

C.     Even if there were evidence from which a jury could conclude that Mr. Bell had lied about the substance of the bargain, Mr. Bell would still be entitled to a new trial because of the deficient jury instructions on intent to harm. Despite Mr. Bell's objections, the district court failed to instruct the jury that the mail- and wire-fraud statutes require a finding of intent to deprive another of money or property and thereby misstated the law. There is no way of knowing whether the jury properly considered that issue or whether the jury would have convicted him if it had been adequately instructed. The theory-of-defense instruction does not render the error harmless, because that

21

instruction was framed as the defendants' view of the facts and was expressly untethered from any legal instruction informing the jury that acquittal was required if the jury agreed that Mr. Bell lacked the intent to deprive anyone of money or property.

Finally on this point, even if the district court correctly stated the law, it still abused its discretion by failing to give the instruction on intent to harm that Mr. Bell requested. That instruction was correct; it was not addressed by the other instructions; and its absence significantly impaired Mr. Bell's ability to present a defense. Accordingly, even if the government had presented sufficient evidence of an intent to deprive another of money or property, reversal and remand for a new trial would be warranted because of the instructional error.

II.    A.    Mr. Bell's false-statement convictions cannot stand because they were based on fundamentally ambiguous statements or answers to fundamentally ambiguous questions, which cannot support a conviction under Section 1001 as a matter of law. Ambiguity undermines both the falsity and specific intent required for a false-statement charge. Where fundamental ambiguity exists, this Court has refused to allow a jury to convict based on conjecture as to the meaning of a phrase.

1.    Mr. Bell's statement to federal agents during an informal conversation on May 28, 2015—that Sterling maintained a "firewall" between the

company and dinar promoters and that he asked promoters not to "drive business" to Sterling—were fundamentally ambiguous. Neither the statement nor the surrounding context made clear what Mr. Bell meant. Mr. Bell could have meant simply that Sterling had no hand in the content of the promoters' speech and did not encourage them to predict an imminent revaluation, which was undeniably true. The agents questioning Mr. Bell were obligated to clarify his response, and Mr. Bell should not bear the burden of their failure to do so.

2.      For the same reasons, the question posed by an agent on June 3, 2015, about whether Mr. Bell told Mr. Keller that he did not want him "direct[ing] business" to Sterling was also fundamentally ambiguous. The ambiguity is particularly apparent because Mr. Bell had just discussed Sterling's advertising on the GET Team forum, which makes it impossible that "direct business" meant only an advertising relationship. The agents once again failed to clarify the meaning of Mr. Bell's statement.

3.      The district court ignored the fundamental ambiguity of Mr. Bell's statements by drawing an unwarranted distinction between ambiguous questions and ambiguous answers. Ambiguous questions and answers pose the same problem of asking a jury to speculate as to the defendant's understanding of the words being used. Regardless, consideration of the informal and unfocused questioning here only highlights the ambiguity. Mr. Bell's false-statement convictions should be reversed.

23

B.    Even if Mr. Bell's statements were not fundamentally ambiguous, reversal would still be warranted for the related reason that the government failed to adduce evidence of the falsity of those statements.  It was the government's burden to negate all reasonable interpretations that would make Mr. Bell's statements true, and it did not satisfy that burden here.  The government offered no interpretation of the word "firewall," let alone one that was demonstrably false.  Quite to the contrary, Agent Ryskoski conceded that he did not know what Mr. Bell meant by the term.  Similarly, the government never explained what "driving" or "directing" business meant or how that differed from Sterling's advertising relationship with promoters, a relationship which Mr. Bell freely acknowledged.  The government failed to negate the reasonable interpretation that Mr. Bell did not tell promoters what to say on their platforms.  Indeed, Agent Ryskoski testified that such an interpretation would be factually accurate.  The government's reliance on inferences and suggestions is not sufficient to prove falsity beyond a reasonable doubt.  Reversal of Mr. Bell's false-statement convictions is warranted for this reason as well.

III.    Even if the government had introduced sufficient evidence on all counts, Mr. Bell's convictions should still be vacated because the district court abused its discretion by admitting a video clip concerning the trial of Brad Huebner.  The unfair prejudice from the sensationalized video substantially outweighed any probative value for purposes of Federal Rule of Evidence 403

24

and affected Mr. Bell's defense, because the superficial similarities between that case and this one obscured the fundamental differences. For that reason, Mr. Bell's convictions should be vacated if they are not reversed outright.

## ARGUMENT

Mr. Bell's conduct as a dinar broker was not criminal, his statements to federal agents cannot support a false-statement conviction, and the district court abused its discretion by admitting the video concerning the conviction of Brad Huebner. *First*, the government failed to prove that Mr. Bell acted with an intent to deprive anyone of money or property. The evidence introduced at trial instead demonstrated that Sterling's customers received precisely what they paid for—an agreed-upon quantity of Iraqi dinars at the present, fair-market value. *Second*, to support Mr. Bell's convictions under Section 1001, the government relied on statements that are fundamentally ambiguous as a matter of law. That lack of evidence requires the reversal of each of Mr. Bell's convictions. *Third*, at a minimum, Mr. Bell's convictions should be vacated because the district court abused its discretion by admitting a highly prejudicial video about the prosecution of Brad Huebner.

## I.    THE GOVERNMENT DID NOT PROVE, AND THE DISTRICT COURT DID NOT PROPERLY INSTRUCT THE JURY CONCERNING, INTENT TO DEPRIVE ANOTHER OF MONEY OR PROPERTY

Conviction under both the wire-fraud and mail-fraud statutes requires proof not only of an intent to deceive, but also of intent to harm by "depriv[ing]" another person of "something of value." *Shaw* v. *United States*, 580 U.S. 63, 72 (2016). As this Court has explained, that intent cannot be shown where a defendant intends to provide, and the alleged victim in fact receives, the benefit of the bargain. *See United States* v. *Takhalov*, 827 F.3d 1307, 1313-1319, *modified on denial of reh'g*, 838 F.3d 1168 (2016). Because that was the case here, the government adduced insufficient evidence to convict Mr. Bell. Compounding the government's failure of proof, the district court failed to instruct the jury that intent to deprive another of money or property is a required element of the offenses. The district court thereby allowed the jury to convict in the absence of any intended deprivation. Mr. Bell's convictions on the fraud and attendant conspiracy counts therefore cannot stand.

### A.    'Intent To Defraud' Requires An Intent To Deprive Another Of Money Or Property

The mail-fraud, wire-fraud, and conspiracy counts on which Mr. Bell was convicted all require proof of a "purpose of executing" a "scheme . . . to defraud." *See* 18 U.S.C. §§ 1341, 1343. That intent to defraud in turn requires

26

an intent not merely to deceive, but also to harm another person by depriving him of money or property.

The Supreme Court has recognized that understanding on a number of occasions. For example, in *Shaw*, the Court addressed a jury instruction in a bank-fraud case that defined a "scheme to defraud" as requiring only "inten[t] to deceive, cheat, *or* deprive a financial institution of something of value." 580 U.S. at 72 (citation omitted). The Court rejected that disjunctive formulation, explaining that "the scheme must be one to deceive the bank *and* deprive it of something of value." *Id.*; *see also United States* v. *Yermian*, 468 U.S. 63, 73 & n.12 (1984) (distinguishing between intent to deceive and intent to defraud). The Court has elsewhere explained that the mail- and wire-fraud statutes are to "be interpreted broadly insofar as property rights are concerned," but should not generally be given a "a more extensive reach." *McNally* v. *United States*, 483 U.S. 350, 356 (1987). The Supreme Court has thus rejected attempts to interpret the mail- and wire-fraud statutes as protecting "intangible rights," *Skilling* v. *United States*, 561 U.S. 358, 400-401 (2010), and repeatedly held that those statutes "prohibit[] only deceptive schemes to deprive the victim of money or property," *Kelly* v. *United States*, 140 S. Ct. 1565, 1571 (2020) (alteration in original; internal quotation marks and citation omitted); *see Cleveland* v. *United States*, 531 U.S. 12, 18-19, 26 (2000).

27

In *Takhalov*, this Court sharply distinguished fraud from mere deception. The defendant bar owners in that case hired "B-girls" to pose as tourists and induce visiting businessmen to patronize the defendants' bars. *See* 827 F.3d at 1310, 1316. The defendants argued that, although they deceived the businessmen as to the relationship between the B-girls and the bars, the businessmen purchasing drinks "got what they paid for—nothing more, nothing less." *Id.* at 1311. Accordingly, the defendants sought an instruction that a "[f]ailure to disclose the financial arrangement between the B-girls and the Bar, in and of itself, is not sufficient to convict a defendant of any offense." *Id.* (citation omitted).

Although the district court refused to give the requested instruction, claiming that it was not an "accurate statement of the law," this Court reversed. *Takhalov*, 827 F.3d at 1311 (citation omitted). The Court held that a scheme to defraud "refers only to those schemes in which a defendant lies about the nature of the bargain itself." *Id.* at 1313. Such lies "take two primary forms": lies about the price and lies about the "characteristics of the good." *Id.* at 1313-1314. The Court cautioned that, "if a defendant lies about something else—*e.g.*, if he says that he is the long-lost cousin of a prospective buyer—then he has not lied about the nature of the bargain, has not 'schemed to defraud,' and cannot be convicted of wire fraud on the basis of that lie alone." *Id.* at 1314.

28

In so holding, the Court relied on the "ordinary meaning" of the word "defraud." *Takhalov*, 827 F.3d at 1312.  Reviewing dictionary definitions, the Court explained that, "to *defraud*, one must intend to use deception to cause some injury," whereas "one can *deceive* without intending to harm at all." *Id.* The Court thus concluded that, "even if a defendant lies, and even if the victim made a purchase because of that lie, a wire-fraud case must end in an acquittal if the jury nevertheless believes that the alleged victims 'received exactly what they paid for.'" *Id.* at 1314 (citation omitted).

Other courts of appeals are in agreement that "intent to defraud" requires an intent to deprive another of money or property.  As this Court recognized in *Takhalov*, the Second Circuit has in a series of cases "drawn a fine line between schemes that do no more than cause their victims to enter into transactions that they would otherwise avoid—which do not violate the mail or wire fraud statutes—and schemes that depend for their completion on a misrepresentation of an essential element of the bargain—which do violate the mail and wire fraud statutes." *Takhalov*, 827 F.3d at 1314 (quoting *United States* v. *Shellef*, 507 F.3d 82, 108 (2d Cir. 2007)); *see also United States* v. *Novak*, 443 F.3d 150, 156 (2d Cir.), *cert. denied*, 549 U.S. 997 (2006); *United States* v. *Starr*, 816 F.2d 94, 98 (2d Cir. 1987); *United States* v. *Regent Office Supply Co.*, 421 F.2d 1174, 1182 (2d Cir. 1970).  The Ninth Circuit has similarly con-

cluded that "a defendant must act with the intent not only to make false state-
ments or utilize other forms of deception, but also to deprive a victim of money
or property by means of those deceptions." *United States* v. *Miller*, 953 F.3d
1095, 1101 (2020), *cert. denied*, 141 S. Ct. 1085 (2021).  And the Fifth Circuit
has explained that an "intent to defraud" involves "an intent to (1) deceive, *and*
(2) cause some harm to result from the deceit." *United States* v. *Evans*, 892
F.3d 692, 712 (2018) (emphasis added; citation omitted); *see also United States*
v. *Ratcliff*, 488 F.3d 639, 645 (5th Cir. 2007).  In all of those circuits, a "defend-
ant must intend to deceive *and* cheat." *Miller*, 953 F.3d at 1101.

The foregoing understanding comports with the historical understand-
ing of similar offenses at the time of enactment of the mail-fraud statute.  For
example, in *Morgan* v. *State*, 42 Ark. 131 (1883), the Arkansas Supreme Court
reversed a hotel owner's conviction for falsely claiming that the visitor's ac-
quaintance had recently stayed at the same hotel, explaining that "the result
of a felonious false pretense must be to obtain property." *Id*. at 139.  An au-
thoritative legal treatise from the period discusses another case involving a
defendant's false representation that he was a naval officer, noting that the
fraud was "too remote[]" from the obtaining of property to constitute a crime.
2 Joel Prentiss Bishop, *Commentaries on the Criminal Law* § 357, at 261
(1858).  Another treatise, on which this Court has relied in interpreting the
mail- and wire-fraud statutes, *see United States* v. *Svete*, 556 F.3d 1157, 1163

30

(11th Cir. 2009) (en banc), *cert. denied*, 559 U.S. 1009 (2010), articulates the same principle. *See* 2 Francis Wharton, *A Treatise on the Criminal Law of the United States* § 2123, at 557 (7th ed. 1874). As all of those authorities recognize, the mail- and wire-fraud statutes do not criminalize deception that merely interferes with a customer's intangible right to engage in decisionmaking with perfect information, as long as the customer receives the benefit of the bargain.

### B.    The Evidence Presented Was Insufficient To Prove An Intent To Deprive Anyone Of Money Or Property

Proper application of the rule enunciated in *Takhalov* requires reversal of Mr. Bell's mail-fraud, wire-fraud, and conspiracy convictions. The evidence at trial conclusively established that Sterling's customers received precisely what they bargained for:  a certain number of dinars at an agreed-upon price. The government has nevertheless argued that Mr. Bell misled customers about the likelihood of a future revaluation by the Iraqi government, *see* Doc. 178, at 5; Doc. 545, at 35-36; Sterling's relationship with Mr. Keller and the GET Team, *see* Doc. 178, at 6-9; Doc. 545, at 53-54; and Sterling's intent to set up exchanges at or near airports, *see* Doc. 178, at 4-5; Doc. 545, at 37. Because none of those issues goes to the nature of the bargain itself, the government's evidence is insufficient to support the jury's verdict.

1.    The government primarily focused on alleged misrepresentations about the likelihood of a revaluation. According to the government, Mr. Keller

31

spread misinformation about an imminent revaluation on conference calls and in chat rooms during Mr. Bell's involvement with Sterling, and Mr. Bell should be held responsible for such statements because Sterling advertised with the GET Team and appeared on conference calls as a sponsor. *See* Doc. 178, at 5; Doc. 545, at 35-36.

Mr. Keller's statements cannot support Mr. Bell's fraud convictions. The value of the dinar is determined purely by the Iraqi government, which sets an exchange rate "pegged to the U.S. dollar." Doc. 540, at 66. As a result of that policy, dinars purchased in 2010 were "worth basically the same thing in 2014, 2015." *Id.* at 66-67. The government elicited no evidence that Sterling misrepresented the worth of the dinars it sold. And Sterling made clear that it sold dinars, not an "investment" with particular expected returns. Def. Ex. 556, at 3. Indeed, at Mr. Bell's direction, Sterling employees were prohibited from offering investment advice. *See* Doc. 528-2, at 128-129; Def. Ex. 520.

Those facts are fatal to the government's case. Statements about the likelihood of a future revaluation are merely predictions about future Iraqi regulatory policy. Such regulatory changes might affect the value of the dinar in the future, but they do not concern the nature or current market value of the dinar being sold. If the rule were otherwise, any seller of canned food that advertised on a website predicting an imminent cataclysm would be guilty of

fraud. Because Sterling's customers received precisely what they paid for—like the purchasers of canned food in the hypothetical—there is no fraud.

2.      The government also claimed that Sterling had a "pumping relationship" with the GET Team, in which Sterling paid Mr. Keller to make misrepresentations about a revaluation to increase Sterling's sales, while hiding those payments from Sterling's customers. Doc. 545, at 53. But even if a flat advertising fee paid in exchange for ad banners and named sponsorship could be characterized as a "pumping relationship," any alleged misrepresentations would still not support the jury's verdict. The government's theory in *Takhalov* was that the defendants concealed their relationships with the B-girls. *See* 827 F.3d at 1322. The government's argument here is indistinguishable; it asserts that the Sterling defendants allegedly concealed the financial relationship between a seller and a third party that induced customers to enter into a transaction. Here, as in *Takhalov*, the allegedly undisclosed fact is completely separate from the bargain between the seller and the customers. In each case, there is no basis to find an intent to harm.

3.      The government's case with respect to the exchanges fares no better. Although the government has argued that the exchanges were part of the "suite of benefits" sold to customers, Gov't Resp. 13, the evidence contradicts that claim. During Mr. Bell's time with the company, Sterling made clear that any exchange services would be open to *all* holders of dinars who lived in an

eligible city and had an eligible amount to exchange, not just those who purchased dinars from Sterling. *See*, *e.g.*, Doc. 531, at 50-51. Because Sterling was offering the service to the general public at no cost, it could not possibly have been a service that Sterling's customers believed they were purchasing as part of their bargain for dinars.

What is more, there is no evidence that Mr. Bell ever misrepresented Sterling's exchange policy. To the contrary, the evidence established that, after he joined Sterling, the policy was updated to ensure it could be implemented. *See* Doc. 528-2, at 69-70; Doc. 530-1, at 34-35; Doc. 533-2, at 48-52, 57-58. The evidence also established that Mr. Bell and Mr. Rhame were licensed pilots with the ability to rent conference rooms at or near airports to undertake precisely the kind of program they advertised. *See* Doc. 528-2, at 100-102; Doc. 530-2, at 45-46; Doc. 541, at 48-49. The plans for such a program were discussed at meetings of Sterling's managers. *See* Doc. 543-2, at 119-120. Mr. Bell also clarified to customers that Sterling would not "roll out, you know 15, 20 offices within the first 24 hours," but that it would take time to "hire, train people and get them in place" after any revaluation. Gov't Ex. 657(b). There is thus no evidence that Mr. Bell deceived anyone, let alone that he sought to deprive anyone of the benefit of the bargain.

4.    The alleged misrepresentations here are plainly distinguishable from the ones in the cases cited by the government, where defendants lied to

investors about the company in which they were investing or the use to which their investments would be put. In *United States* v. *Watkins*, 42 F.4th 1278 (11th Cir. 2022), the lies "about how the investment money would be spent" and the defendant's "ability to pay [a] loan back" both "affected the nature of the bargain." *Id.* at 1282 n.5. Similarly, in *United States* v. *Wheeler*, 16 F.4th 805 (11th Cir. 2021), *cert. denied*, 142 S. Ct. 2794 (2022), the defendants sold stock in several companies, and in so doing, lied both about the "characteristics of the good" and issues separate from the object of the bargain. *Id.* at 820. This Court explained that a "reasonable jury could infer that facts like [a company's] profits, its association with a famous executive and a globally recognized technology company, and a potential listing on a major stock exchange are essential characteristics of the stock." *Id.* By contrast, representations that the salesmen were employees of the relevant company were held not to be lies about the bargain itself. *See id.*

Here, statements concerning the potential revaluation, the relationship between Mr. Keller and Sterling, and the exchanges fall into that latter category, because they do not relate to the nature of the dinars being sold. The government thus failed to identify any evidence that Mr. Bell intended to deprive customers of money or property.

**C.    In The Alternative, The District Court Erred By Failing Correctly To Define 'Intent To Defraud' In Its Jury Instructions**

1.    Even if there were evidence that Mr. Bell possessed the relevant intent to harm, this Court should vacate Mr. Bell's convictions and remand for a new trial because the district court's instructions misstated the law.  Under the mail- and wire-fraud statutes, the defendant must intend to "deceive the [victim] *and* deprive [him] of something of value."  *Shaw*, 580 U.S. at 72.  In fact, soon after the trial, the Judicial Council amended its pattern jury instructions to add that "[p]roving intent to deceive alone, without the intent to cause loss or injury, is not sufficient to prove intent to defraud."  *See* Eleventh Circuit Pattern Jury Instructions, Criminal Cases O50.1 (2019 rev.) <tinyurl. com/11cirjuryinstr>.  This Court recently upheld that instruction in *Watkins* because "the jury could not have convicted [the defendant] without finding that his misrepresentations were made with an intent to cause loss or injury to the individuals from whom he solicited money."  42 F.4th at 1287.  Here, over the defendants' objections, *see* Doc. 544, at 105-164, the district court defined "intent to defraud" merely as "intent to deceive *or* cheat someone, *usually* for personal financial gain *or* to cause financial loss to someone," Doc. 546, at 36, 38 (emphasis added).  Unlike in *Watkins*, the district court erroneously omitted the requirement of intent to deprive another of money or property.

Where, as here, the jury instructions incorrectly define an element of the offense, the conviction must be vacated and remanded for a new trial unless this Court can find that the error was harmless beyond a reasonable doubt. *See*, *e.g.*, *Pope* v. *Illinois*, 481 U.S. 497, 502-504 (1987). The district court's error was not harmless under that standard because "'the record contain[s] evidence that could rationally lead' a jury to find that the defendant[] lacked the intent to defraud" if the proper instructions had been given. *Takhalov*, 827 F.3d at 1321 (quoting *Neder* v. *United States*, 527 U.S. 1, 19 (1999)); *see United States* v. *Mayweather*, 991 F.3d 1163, 1175 (11th Cir. 2021). Here, Mr. Bell presented evidence that any perceived misrepresentations could not constitute fraud because customers received exactly the dinars they paid for at exactly the price they were willing to pay. *See* pp. 31-34, *supra*. The government's case therefore hinges on one of two propositions: that Sterling sold some kind of abstract "investment" that included implicit assurances of a likely revaluation, or that Sterling packaged its dinar sales as part of a "suite of benefits," Gov't Resp. 13, that included exchange services at or near airports.

As explained above, the evidence belies both propositions. *See* pp. 31-34. Without an instruction that intent to deprive another of money or property was necessary, the jury could have convicted based on deceptions that the jury believed to be collateral to the bargain. Indeed, the jury might have convicted

because it (incorrectly) believed that Mr. Bell deceived customers about Sterling's relationship with Mr. Keller—a deception indistinguishable from the one at issue in *Takhalov*. Because the evidence here was "not so overwhelming that an acquittal would have been irrational" if the correct instructions had been given, the error was not harmless beyond a reasonable doubt. *Takhalov*, 827 F.3d at 1322.

The district court's "theory of defense" instruction did not render the error harmless. The district court provided that instruction separately from its instructions on the law, and it emphasized that the instruction addressed only "the defendants' way of telling you their positions on *what they believe the facts* showed in the case." Doc. 546, at 21 (emphasis added). The court failed to include an instruction that, if the jury agreed with those facts, there could be no intent to harm as a matter of law. Because there was no instruction that a defendant is guilty only if he intends to "depriv[e] [someone] of something of value" or that no intent to defraud exists where the alleged victims "received exactly what they paid for," it is unreasonable to presume that the jury would have applied the law properly to Mr. Bell's case. *See Takhalov*, 827 F.3d at 1313-1314; Doc. 544, at 115. The failure to give a correct instruction on intent to deprive another of money or property thus requires, at minimum, a new trial on the fraud and conspiracy counts.

38

2.    Even if the district court did not misstate the law, it nonetheless abused its discretion by refusing to give Mr. Bell's requested instruction. For the reasons discussed above, the instruction "(1) was correct, (2) was not substantially covered by a charge actually given, and (3) dealt with some point in the trial so important that failure to give the requested instruction seriously impaired the defendant's ability to conduct his defense." *United States* v. *Dohan*, 508 F.3d 989, 993 (11th Cir. 2007) (citation omitted), *cert. denied*, 553 U.S. 1034 (2008). Mr. Bell's defense was premised on the theory that Sterling had provided customers with what they had purchased. *See* pp. 31-34, 37-38, *supra*. A jury instruction explaining the legal relevance of that theory was essential to his case, and the failure to provide that instruction leaves this Court with no way of knowing whether the jury applied the correct legal standard. For that reason as well, Mr. Bell's fraud and conspiracy convictions should be vacated if not reversed outright.

## II.    THE GOVERNMENT FAILED TO PRESENT SUFFICIENT EVIDENCE OF A FALSE STATEMENT

The government also failed to introduce sufficient evidence that Mr. Bell made a false statement. To sustain a conviction under 18 U.S.C. § 1001, the government had to prove "(1) that a statement was made; (2) that it was false; (3) that it was material; (4) that it was made with specific intent; and (5) that it was within the jurisdiction of an agency of the United States." *United States* v. *Calhoon*, 97 F.3d 518, 523 (11th Cir. 1996), *cert. denied*, 522 U.S. 806 (1997).

The government based its claims on statements that Mr. Bell made in two separate meetings with FBI agents. *First*, in a conversation on May 28, 2015, Mr. Bell stated that Sterling maintained a "firewall" with unnamed dinar promoters and that he had told promoters that their job was not to "drive business" to Sterling. Gov't Ex. 50-1, at 9-10. *Second*, in an interview on June 3, 2015, Mr. Bell responded to an agent's suggestion that Mr. Keller was "direct[ing] business" to Sterling by stating that he had told Mr. Keller that he didn't "want him doing it" and didn't "want to hear" that Mr. Keller had been doing it. Gov't Ex. 52-1, at 18-19. Both allegedly false statements are fundamentally ambiguous as a matter of law, and reversal is therefore required. What is more, because the government did not clarify the ambiguity, there was also insufficient evidence that either statement was false. For either of those reasons, Mr. Bell's false-statement convictions cannot stand.

### A.   Mr. Bell's Statements Were Too Ambiguous To Support A Conviction

1.    This Court has held that "fundamentally ambiguous" statements (or answers to fundamentally ambiguous questions) are "insufficient as a matter of law" to support a conviction under Section 1001. *United States* v. *Manapat*, 928 F.2d 1097, 1099 (11th Cir. 1991) (citation omitted). Such ambiguity calls into doubt both the falsity of the statement and the defendant's specific intent in making it. "[A] question or phrase is ambiguous as a matter of law when it 'is not a phrase with a meaning about which men of ordinary intellect

could agree, nor one which could be used with mutual understanding by a questioner and answerer unless it were defined at the time it were sought and offered as testimony.'" *Id*. at 1100 (citation omitted).

When a statement, considered in its surrounding context, is fundamentally ambiguous, a court "cannot allow juries to criminally convict a defendant based on their guess as to what the defendant was thinking at the time the response was made." *Manapat*, 928 F.2d at 1101. That rule serves to "preclude convictions that are grounded on little more than surmise or conjecture" and to prevent defendants from "unfairly bearing the risks associated with the inadequacies of their examiners." *United States* v. *Ryan*, 828 F.2d 1010, 1015 (3d Cir. 1987), *abrogated on other grounds by United States* v. *Wells*, 519 U.S. 482 (1997); *see also Manapat*, 928 F.2d at 1101. As in the related contexts of perjury and other federal statutes prohibiting false statements, the burden is on the questioner to seek clarification of any ambiguity. *See*, *e.g.*, *Bronston* v. *United States*, 409 U.S. 352, 360 (1973); *United States* v. *Swindall*, 971 F.2d 1531, 1553 (11th Cir. 1992), *cert. denied*, 510 U.S. 1040 (1994).

2.     Mr. Bell made the first allegedly false statement in an informal conversation with FBI agents at Sterling's offices regarding the dinar trade and the practices of other brokers. After welcoming the agents, Mr. Bell began giving the agents "background" information about Sterling and the dinar

trade. Gov't Ex. 50-1, at 5. During that conversation, Mr. Bell explained the dinar chat forums and said:

> I mean the reason we sell a lot [of dinar] is there are a bunch of guys out there hyping this stuff, you know. They create a forum. They attract, you know, people and they sell advertising. You know, they make good money because they generate a lot of traffic at their sites. . . . Anyway, *we maintain a firewall between us and those guys*. We might put a banner ad on their site, but I mean I tell them I do not, you know, *your job is not to drive business to my website*. I do not want you doing that. Okay. Because I think it's a moral hazard, in my opinion.

*Id.* at 9-10 (emphasis added). That statement was not made in response to any direct question from the agents. Mr. Bell did not make clear what he meant by a "firewall," nor did he explain how "driv[ing] business" to Sterling differed from Sterling's acknowledged advertising relationships.

At trial, Agent Ryskoski admitted that he did not know what Mr. Bell meant by a "firewall," and that he did not ask Mr. Bell to elaborate. *See* Doc. 534, at 42. Agent Ryskoski further testified that none of the dictionary definitions of "firewall" makes sense in context. *See id.* at 45-47. As he recognized, Mr. Bell used "firewall" in an "informal manner" and "some people may have different interpretations" of the term. *Id.* at 47. Mr. Bell could have meant that Sterling did not control or influence what the dinar promoters said, or that Sterling was not paying dinar promoters commissions that might influence them to overstate the likelihood of revaluation. Both interpretations are

accurate with respect to Sterling's then-existing relationships with dinar promoters, and neither reflects an effort to deceive the FBI agents. Despite realizing that and having ample opportunity to inquire further during the informal conversation, the agents failed to clarify what Mr. Bell meant by "firewall." *See id*. at 42-43. Mr. Bell should not be made to bear the consequences of that failure.

The same is true of Mr. Bell's statement that he asked unnamed dinar promoters not to "drive business" to Sterling's website. Agent Ryskoski admitted that, given the immediately preceding sentence in which Mr. Bell acknowledged that Sterling advertised with dinar promoters, "driv[ing] business" must have meant something other than advertising. *See* Doc. 534, at 48. For example, Mr. Bell could have meant that he asked dinar promoters not to promote Sterling over other brokers that advertised with the promoters, or that he told promoters that the content of their programs should not be affected by Sterling's sponsorship. Once again, there is no evidence that those statements were anything other than true. And once again, the agents failed to seek clarification of Mr. Bell's statement. *See id*.

Nor does the broader context of the conversation provide any further clarity. The conversation ranged from the dinar-brokerage business more broadly to other brokers' misconduct. The scope of the conversation thus pro-

43

vides no meaningful background to assess how Mr. Bell understood the ambiguous terms. The statement at issue was not even made in response to a particular question; instead, Mr. Bell was informing the FBI of the "big picture" of the dinar brokerage and his general dealings with dinar forums. Gov't Ex. 50-1, at 9. In short, Mr. Bell's May 28 statement was fundamentally ambiguous as a matter of law.

3.    Mr. Bell's statement in his second interview with the FBI was fundamentally ambiguous for similar reasons. The conversation at issue began with the agents asking Mr. Bell for background information on his relationship with Mr. Rhame and Mr. Shaw and on his involvement in the dinar business. *See* Gov't Ex. 52-1, at 2-13. Eventually, the agents expressed interest in discussing dinar promoters. *See id.* at 13-14. Mr. Bell explained that, although Sterling "advertise[s] on some sites," he created a rule that "we do not promote, we don't talk about [the revaluation]," because of the "moral hazard." *Id.* at 14. Mr. Bell later told the agents that he "did everything [he] could to insulate" Sterling from the talk of revaluation, and to "instruct everyone in the company, you do not encourage people to buy." *Id.* at 15. The agents agreed that Sterling "employees were instructed not to give advice," and they asked for additional information about Sterling's relationship with the GET Team. *Id.* at 15-16. Mr. Bell described the flat advertising fee and the content of the GET Team's conference calls—the state of affairs in Iraq and the chances of

44

revaluation—while making clear that he did not participate in those discussions. *Id.* at 16.

The agents then brought up an e-mail in which Mr. Keller asked "how business is" and stated that he has "really been promoting the heck out of it." Gov't Ex. 52-1, at 18. The agents noted their concern that "promoters are sending direct messages about kind of what they're doing in these chat rooms to *direct business to Sterling*." *Id.* (emphasis added). Mr. Bell responded that he had told Mr. Keller, "I don't want him doing it and I don't want to hear about it." *Id.* at 18-19. According to the government, it is that final statement that was false.

Like "drive business," the phrase "direct business" is fundamentally ambiguous. As in the first interview, Mr. Bell's statement was made after describing how Sterling advertised with Mr. Keller, so the statement must have referred to something other the agreed-upon flat-fee advertisements and sponsorship. But the record reveals no understanding as to what that something might be, because the agents once again failed to seek clarification. The government thus left significant gaps in its questioning that cannot be filled by conjecture.

The broader context provides no help to the government either. Indeed, the longer line of questioning leading to this exchange reveals that the alter-

45

native interpretations of the phrase "drive business" put forth above are reasonable, if not likelier, than a mere advertising relationship. The conversation focused on whether Mr. Bell was aware of Mr. Keller's representations about the possibility of revaluation of the dinar on GET Team conference calls. *See* Gov't Ex. 52-1, at 16-18. When the agent asked Mr. Bell moments later about an e-mail in which Mr. Keller wrote to Mr. Bell that he has been "promoting" Sterling, it is likely that Mr. Bell's response referred to whether Mr. Bell knew or approved of Mr. Keller's tactics to encourage potential customers to buy dinars, not whether Mr. Keller and Sterling had any advertising relationship whatsoever. *See id.* at 18-19. The June 3 statement was thus fundamentally ambiguous as well.

4. The district court ignored the fundamental ambiguity of Mr. Bell's statements after drawing a baseless distinction between ambiguous questions and ambiguous answers. *See* Doc. 678, at 22. Although this Court enunciated its test for ambiguity in a case involving an ambiguous question, *see Manapat*, 928 F.2d at 1100-1101, the decision is equally applicable to a fundamentally ambiguous statement by a defendant. The problem in either circumstance is that the jury cannot possibly determine whether the defendant made a false statement to the government. Indeed, Mr. Bell's statement that he did not want promoters "directing business" to Sterling is indistinguishable from his agreement with Agent Baucom's question about whether promoters were

"driving business" to Sterling.  As with asking the jury to speculate about the meaning of a statement in response to a fundamentally ambiguous question, asking the jury to determine the meaning that a "defendant had in mind" when he provided a fundamentally ambiguous answer would require the "jury to aspire to levels of insight to which the ordinary person is incapable, and upon which speculation no criminal indictment should hinge."  *Id.* at 1100 (citation omitted).  It is therefore unsurprising that other courts have applied the same rule to the ambiguity of defendants' answers.  *See*, *e.g.*, *United States* v. *Rahman*, 805 F.3d 822, 838-839 (7th Cir. 2015); *United States* v. *Hirsch*, 360 F.3d 860, 863 (8th Cir. 2004); *United States* v. *Diogo*, 320 F.2d 898, 905 (2d Cir. 1963).

Even if the district court were correct that fundamental ambiguity must be informed by the line of questioning, that would not solve the government's problem.  As an initial matter, the ambiguity in the second allegedly false statement comes from the agent's question regarding promoters claiming to "direct business" to Sterling.  The ambiguity in that statement is thus attributable solely to the government.  What is more, both statements occurred in the context of compound, rambling comments and questions.  When that "confusing" context is examined, *Manapat*, 928 F.2d at 1101, the fundamental ambiguity inherent in the statements becomes even more apparent.  The government's method of questioning failed to provide any certainty as to Mr. Bell's

47

meaning, and a "criminal conviction is a drastic sanction when no questioner pinned [him] down" by asking "a single additional question or two." *Rahman*, 805 F.3d at 839. Because Mr. Bell's statements were fundamentally ambiguous as a matter of law, reversal of the false-statement convictions is warranted.

### B.    In The Alternative, The Government's Failure To Introduce Sufficient Evidence Of Falsity Requires Reversal

Even if the statements were not fundamentally ambiguous, the government nevertheless failed to introduce substantial evidence of the statements' falsity. In a prosecution for making false statements, the government must prove that the defendant "inten[ded] to deceive or mislead" government agents. *United States* v. *Boffil-Rivera*, 607 F.3d 736, 741 (11th Cir. 2010). More specifically, the government bears the burden of negating all reasonable interpretations that would make the defendant's statements factually correct. *See United States* v. *White*, 765 F.2d 1469, 1479 (11th Cir. 1985). The government failed to satisfy that burden here.

1.    The government failed to establish any interpretation of the term "firewall," let alone one that renders the statement unambiguously false. *See* Doc. 534, at 45-47. Agent Ryskoski admitted that he did not know what Mr. Bell meant and that no dictionary definition made sense in context. *See* pp. 42-43, *supra*. Agent Ryskoski instead testified only that, in the e-mails and conference calls involving Mr. Bell and Mr. Keller that he reviewed, there were no references to a "firewall." Doc. 533-1, at 59, 66. As an initial matter, Mr.

Bell communicated with Mr. Keller by phone as well as by e-mail, rendering the government's evidence incomplete at best. *See* Doc. 829-34, at 36. What is more, that Mr. Bell did not refer to a "firewall" in e-mails or on conference calls does nothing to prove what he meant or that a firewall did not exist. Indeed, to the extent that Mr. Bell meant that he did not tell promoters what to say on their platforms—an interpretation that the government has never shown to be unreasonable—Agent Ryskoski provided testimony affirming that he had not "seen e-mails in which Mr. Bell told Mr. Keller what to say." Doc. 533-1, at 66. The government's evidence concerning the limited number of communications that Agent Ryskoski reviewed is thus wholly insufficient to show that there was an agreed-upon meaning, much less that any plausible meaning was knowingly false.

2.     The government also failed to negate the possibility that Mr. Bell's statements that he asked dinar promoters not to "drive business" or "direct business" to Sterling referred to a request either not to promote Sterling over other brokerages or to alter the content of their speech to further Sterling's interests. To show the falsity of those statements, the government again relied entirely on conjecture and negative inferences drawn by Agent Ryskoski, who testified he had not seen e-mail communications from Mr. Bell to that effect. *See* Doc. 533-1, at 59, 66. But the government cannot meet its burden of proving falsity by pointing to e-mails from Mr. Keller telling Mr. Bell that he had

been promoting Sterling. *See*, *e.g.*, *id.* at 57. Those e-mails are consistent with the advertising relationship between Sterling and the GET Team, which Mr. Bell repeatedly acknowledged in his meetings with the FBI, and with Mr. Keller's apparent desire to do more for Sterling, which Mr. Bell likewise acknowledged and criticized. *See* Gov't Ex. 52-1, at 16-21. As a result, "direct[ing]" or "driv[ing]" business must mean something more than a standard advertising relationship. The government failed to establish what the agent or Mr. Bell meant in using those terms, and Mr. Keller's e-mails reveal nothing more than an advertising relationship. The government thus failed to introduce sufficient evidence that Mr. Bell's statements were false, even if they were not fundamentally ambiguous.

## III. THE DISTRICT COURT ABUSED ITS DISCRETION BY ADMITTING A HIGHLY PREJUDICIAL VIDEO ABOUT A DIFFERENT CASE

Federal Rule of Evidence 403 requires a court to "exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice." The government introduced a sensationalized CNBC news segment about an unrelated prosecution, and the district court abused its discretion by concluding that the unfair prejudice from that video did not substantially outweigh the video's purported probative value.

To begin with, the video was enormously prejudicial. There "can be no question that evidence of the name or nature of [a defendant's] prior offense

generally carries a risk of unfair prejudice to the defendant." *Old Chief* v. *United States*, 519 U.S. 172, 185 (1997). *A fortiori*, the prejudice is exacerbated when the government introduces evidence of *someone else's* prior offense. The government did exactly that by introducing a video about the conviction of a different dinar seller above the dramatic captions "CRIME & PUNISHMENT" and "IRAQI DINAR SCAM." *See* Gov't Ex. 709(a).

At most, the video had limited probative value. Brad Huebner was neither a defendant nor a co-conspirator in this case. The government contended that the video was evidence of Mr. Bell's knowledge that Sterling was violating the law. Assuming that he actually viewed it, the video would only have put him on notice that a dinar seller who hosts conference calls about the dinar where he predicts a revaluation and misleads customers about fake hedge funds violates the law. The video would not have put Mr. Bell on notice that he was breaking the law by working for a company that advertised with a third-party website in exchange for a flat fee, refused to provide investment advice, and never sold interests in a fake hedge fund.

The district court's limiting instruction cannot salvage the convictions. A "limiting instruction may not always sufficiently reduce the risk that the jury will misuse" evidence. *United States* v. *Elysee*, 993 F.3d 1309, 1342 (11th Cir. 2021), *cert. denied*, 142 S. Ct. 2782 (2022); *see also Stockman* v. *Oakcrest*

51

*Dental Center, P.C.*, 480 F.3d 791, 805 (6th Cir. 2007). Here, it was unreasonable to expect the jury to be able to distinguish between two cases that had superficial similarities but fundamental differences. For example, both Sterling and Mr. Huebner sold dinars, but Mr. Huebner also sold the right to participate in non-existent hedge funds. Mr. Huebner hosted conference calls, but Sterling merely advertised on third-party calls in exchange for a flat fee. Mr. Huebner predicted a revaluation, but Mr. Bell ensured that Sterling advised customers to do their own research and never provided them with investment advice. Even Mr. Huebner's lies about his partner's military service prejudiced the jury with respect to Mr. Bell and Mr. Rhame, who never embellished their distinguished service records. *See* Gov't Ex. 709(a). At the very least, then, Mr. Bell's convictions should be vacated because the district court abused its discretion by admitting the video.

## CONCLUSION

The judgment of the district court should be reversed and remanded with instructions to enter a judgment of acquittal. In the alternative, the judgment should be vacated and the case remanded for a new trial.

Respectfully submitted,

/s/ Kannon K. Shanmugam

EMILY A. VANCE                          KANNON K. SHANMUGAM
PAUL, WEISS, RIFKIND,                   BRIAN M. LIPSHUTZ
  WHARTON & GARRISON LLP       YISHAI SCHWARTZ
  *1285 Avenue of the Americas* PAUL, WEISS, RIFKIND,
  *New York, NY 10019*            WHARTON & GARRISON LLP
                                *2001 K Street, N.W.*
                                *Washington, DC 20006*
                                *(202) 223-7300*

DECEMBER 19, 2022

53

## CERTIFICATE OF COMPLIANCE
## WITH TYPEFACE AND WORD-COUNT LIMITATIONS

I, Kannon K. Shanmugam, a member of the Bar of this Court and counsel for defendant-appellant Frank Bell, hereby certify, pursuant to Federal Rule of Appellate Procedure 32(a)(5) and 32(a)(6), that the attached Brief of Defendant-Appellant Frank Bell is proportionately spaced, has a typeface of 14 points or more, and contains 12,443 words.

DECEMBER 19, 2022                      /s/ Kannon K. Shanmugam
                                       KANNON K. SHANMUGAM

# STATUTORY ADDENDUM

# STATUTORY ADDENDUM
## TABLE OF CONTENTS

Page

18 U.S.C. § 1001 ................................................................ Add. 1

18 U.S.C. § 1341 ................................................................ Add. 2

18 U.S.C. § 1343 ................................................................ Add. 3

**18 U.S.C. § 1001**

**Statements or entries generally**

(a)     Except as otherwise provided* in this section, whoever, in any matter within the jurisdiction of the executive, legislative, or judicial branch of the Government of the United States, knowingly and willfully—

(1)     falsifies, conceals, or covers up by any trick, scheme, or device a material fact;

(2)     makes any materially false, fictitious, or fraudulent statement or representation; or

(3)     makes or uses any false writing or document knowing the same to contain any materially false, fictitious, or fraudulent statement or entry;

shall be fined under this title, imprisoned not more than 5 years[,] * * * or both.

* * *

Add. 1

## 18 U.S.C. § 1341

## Frauds and swindles

Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, or to sell, dispose of, loan, exchange, alter, give away, distribute, supply, or furnish or procure for unlawful use any counterfeit or spurious coin, obligation, security, or other article, or anything represented to be or intimated or held out to be such counterfeit or spurious article, for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, or deposits or causes to be deposited any matter or thing whatever to be sent or delivered by any private or commercial interstate carrier, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail or such carrier according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing, shall be fined under this title or imprisoned not more than 20 years, or both.

\* \* \*

## 18 U.S.C. § 1343

## Fraud by wire, radio, or television

Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than 20 years, or both.

* * *