[PUBLISH]

In the

# United States Court of Appeals

### For the Eleventh Circuit

_____

No. 22-12750

_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

*versus*

FRANK BELL,
TYSON RHAME,
JAMES SHAW,

Defendants-Appellants.

_____

Appeals from the United States District Court
for the Northern District of Georgia
D.C. Docket No. 1:16-cr-00067-SCJ-CMS-4

_____

Before WILLIAM PRYOR, Chief Judge, and JILL PRYOR and BRASHER, Circuit Judges.

WILLIAM PRYOR, Chief Judge:

This criminal appeal concerns currency sellers who defrauded retail investors and made false statements to federal agents. Tyson Rhame, James Shaw, and Frank Bell were owners and officers of Sterling Currency Group, a currency-exchange business that sold over $600 million worth of Iraqi dinar and other currencies. The sellers promoted false rumors of an imminent dinar revaluation, concealed that Sterling paid to advertise on dinar-discussion web forums and conference calls, and falsely represented that Sterling planned to open physical currency-exchange kiosks across the country. Rhame and Bell also lied to federal agents when interviewed about their activities. After a five-week trial, the jury convicted the sellers of conspiracy to commit mail and wire fraud, mail fraud, wire fraud, and false statements. The district court sentenced Rhame, Shaw, and Bell to 180, 95, and 84 months in prison, respectively. On appeal, the sellers challenge the sufficiency of the evidence, jury instructions, evidentiary admissions, and Rhame's sentence. We affirm the convictions and Rhame's sentence, except for the refusal to grant a downward departure, the appeal of which we dismiss for lack of jurisdiction.

## I. BACKGROUND

Tyson Rhame and James Shaw founded and owned Sterling Currency Group, a currency-exchange business that sold mainly Iraqi dinar from 2004 until 2015. Sterling began in 2004 as a "garage-

run" business, which operated out of Rhame's and Shaw's homes and sold millions of dollars' worth of currencies a year. In the early years, Rhame managed most of Sterling's daily operations, including compliance, banking, web content, shipping, logistics, and customer service. Shaw's wife helped fulfill orders, while Shaw remained mostly removed from daily operations.

Sterling began expanding in earnest in early 2010, and the company hired Frank Bell. Bell became Sterling's Chief Operating Officer in 2013. As the "compliance guy," Bell was responsible for legal compliance and training employees to adhere to laws and regulations.

Sterling's sale of the Iraqi dinar was legal. Much of its market was retail: most mainstream exchanges refuse to sell the dinar because the currency is pegged by the Iraqi government, the exchange rate remains mostly stable, and a non-market-driven currency is often unattractive to professional traders. But the dinar remained popular with retail investors because of perennial rumors that the Iraqi government would soon "revalu[e]" the currency and its value would skyrocket.

Sterling sold dinars to investors both outright and through layaway programs. Outright purchasers paid upfront and immediately received packages of dinars through the mail. Layaway purchasers paid an initial deposit equal to a percentage of their total purchase and were given a specified timeframe to pay off the remaining balance. Sterling offered more expensive, "guaranteed" layaway options—in which the investor would eventually receive

the value of his deposit in dinars no matter if he paid off his balance—as well as cheaper, nonguaranteed options—in which the investor would forfeit his deposit if he did not pay in time.

Belief in the revaluation was a crucial incentive for layaway purchasers, who often lacked the cash needed for an outright purchase. Purchasers testified that their layaway deposits were a bet on revaluation occurring before their balances came due, such that their earnings from the currency appreciation could be used to pay off the remaining balance. But because no revaluation occurred, purchasers who failed to pay their balances in time forfeited tens of thousands of dollars in nonrefundable deposits. For example, one investor lost over $57,000 on 254 nonrefundable deposits, another lost over $40,000 on 320 deposits, and a third lost over $90,000 on 125 deposits. These forfeitures occurred under the terms specified in the layaway contracts. The sellers knew that some cash-strapped layaway purchasers were motivated by the expectation of a revaluation. Sterling repeatedly received emails from purchasers who pleaded for extensions so that they would not miss the revaluation they believed imminent.

Dinar promoters used online forums regularly to spread the rumors that fueled layaway purchasers' belief in an imminent Iraqi dinar revaluation. Terrence Keller ran one forum called GET Team. Keller and other GET Team promoters posted often, hosted telephone conference calls, and ran chat sessions discussing the revaluation. Participants primarily discussed "rumors" of the likelihood of a revaluation, and Keller "quite often" stated that a

revaluation was "happening tonight" or "tomorrow," though the rumors never panned out. But followers still believed that Keller had "knowledge" and "contacts with the Federal Reserve" who offered "an inside track to . . . the dinar world and when it would revalue." And followers believed that the revaluation would result in a "financial windfall" that would multiply the value of their dinar holdings.

Rhame, Shaw, and Bell did not believe that a revaluation was likely or imminent—and Bell even called the rumors of a rapid revaluation "mythology." For example, in November 2010, Shaw emailed Rhame to express concerns that he did not want "to risk everything based on [Rhame's] belief . . . that the Iraqi dinar will not [revalue] and it is ok to make millions of dollars in false promises to our customers," and that the sellers were "risking serious jail time as promoters of a ponzi scheme." Shaw's brother testified that Shaw never said that he expected the dinar to "skyrocket overnight" and, in fact, expected "[j]ust the opposite." Rhame wrote a memorandum to a compliance consultant in 2011 that stated that dinar pricing appeared "very stable with no drastic changes in value expected in the coming year" and that "[n]o revaluation or denomination changes are expected."

Still, the sellers promoted misinformation in three ways. First, they encouraged the spread of false revaluation rumors both directly and through the GET Team. For example, Rhame wrote an article for the Sterling website that predicted a "sudden significant[] (overnight/over weekend) high revaluation" that could be

"anywhere along the entire spectrum of rumored possibilities from $[0].01 to $1.49." And in late 2010, Sterling began partnering with the GET Team to spread misinformation. Eventually, Sterling paid the GET Team $4,000 a month. In exchange, Keller displayed Sterling ads, allowed Sterling representatives to join conference calls, and encouraged his followers to buy more dinars from Sterling. This partnership allowed Sterling to push its desired narrative. For example, in an email chain scheduling a Sterling appearance on a GET Team call, Keller told Bell, "what ever you would like to bring to the table Im game for it. . . . You are the group im pushing behind the picture." In a private message that Keller sent to a Sterling employee during a simultaneous public chat with followers, Keller bragged, "u like how I have them [the followers] talking and now they will buy more."

Second, the sellers concealed that Sterling paid for advertising on GET Team's website and in conference calls. Although Keller informed followers that Sterling was a "sponsor" of the site, he never revealed any financial details. Indeed, Keller sought reassurance of secrecy and emailed Rhame and Bell, "I want to make sure that our arrangement is between us and no one else . . . As no one else needs to know about our arrangement . . . Please confirm." Bell responded, "Absolutely noone but us." A Sterling customer service manager testified that if investors asked whether Keller "was being paid to pump Sterling's [layaway program]," the "response would be no."

Third, the sellers told investors that Sterling planned to open physical exchange kiosks at airports around the country within days or hours of a revaluation, despite having no such plans. The airport plan was material to the deception because it lent credibility to the idea that a revaluation was likely and misled investors into believing that Sterling would provide the easiest and cheapest option to exchange dinars for dollars.

In 2015, federal agents twice interviewed Bell about his involvement with Sterling. Bell touted Sterling's legal compliance regime and distanced himself from the so-called "sketchy" online dinar promoters and forums. He explained that "there are a bunch of guys out there hyping [the dinar] . . . . They create a forum. They attract . . . people and they sell advertising. . . . [T]hey make good money because they generate a lot of traffic at their sites." Bell admitted that Sterling advertised on dinar forums, but he asserted that he affirmatively told promoters not to send business to Sterling.

Federal agents also interviewed Rhame. Rhame repeatedly denied ever promoting the dinar as a good investment, predicting a revaluation, or having anything to do with dinar promoters or forums. An agent asked, "[Y]ou've never—you personally or on your website or anything like that have ever said [anything] promoting [the dinar] as a good investment." Rhame responded, "Hell, no. . . . Never. You will never find that anywhere." The agent then asked whether Sterling had ever paid a dinar promotion site, and Rhame responded, "I'm 100% positive that any website

that we would be associated with . . . would have nothing to do with any kind of investment promotion or any revaluation or anything like that, because that's just not what we do." Rhame further asserted, "We do not promote anything. . . . and we don't incentivize anybody else to do it . . . . [I]f we advertise with somebody, there's no way in a million years we incentivized them to do that or anything else like that." He stated that Sterling's advertisements were limited to "strictly, you know, a posting of a banner."

A grand jury indicted Rhame, Shaw, Bell, and Keller. The indictment charged the four defendants with conspiracy to commit mail and wire fraud, 18 U.S.C. § 1349; aiding and abetting each other to commit four counts of mail fraud, *id.* §§ 2, 1341; and aiding and abetting each other to commit four counts of wire fraud, *id.* §§ 2, 1343, 1349. The indictment also charged Rhame, Shaw, and Bell with conspiracy to commit money laundering, *id.* § 1956(h); Rhame and Shaw with money laundering, *id.* §§ 2, 1957, 1952; and Rhame and Bell with making false statements to federal agents, *id.* § 1001(a)(2). The prosecution later dismissed 20 of the fraud and money laundering counts.

Over nearly five weeks of trial, the prosecution called 20 witnesses and introduced over 300 exhibits. The sellers objected to several evidentiary submissions, all of which the district court admitted. The district court admitted news articles and press releases warning that Iraqi dinar sales were a scam, to show that the sellers were on "notice" that their conduct was illegal. These included a Forbes article about "The Iraqi Dinar Scam"; a warning post from

a blogger pseudonymously named "Nutrition Dude"; a purported Bank of America notice warning of dinar sales; and a CNBC news segment about the prosecution of Brad Huebner. Huebner was another dinar seller who had hosted conference calls predicting a revaluation, lied about his business partner's military service, and falsely claimed to be starting hedge funds to service his buyers' imminent wealth. The district court gave limiting instructions accompanying these admissions. The district court also permitted Sterling investors to read aloud from previously admitted exhibits of the sellers' emails and other communications. And the district court admitted evidence of Rhame's lavish lifestyle to prove greed as his motive for money laundering and fraud.

The prosecution presented no evidence that Sterling violated its contractual obligations to investors. A case agent testified that every Sterling customer, so long as she paid outright or fulfilled the terms of her layaway program, received the dinars that she paid for. And no right to access airport exchanges was included as a term in any investor contract.

The sellers requested a jury instruction on the fraud counts. Their instruction distinguished between the intent to deceive and the intent to defraud, as described by this Court in *United States v. Takhalov*, 827 F.3d 1307, 1315 (11th Cir. 2016). Although the sellers "agree[d] that *Takhalov* didn't say . . . the pattern jury instruction was wrong," they proposed that the district court add the highlighted language to the then-current version of instructions for mail fraud and wire fraud:

To act with "intent to defraud" means to act know-
ingly and with the specific intent to deceive or cheat
someone, usually for personal financial gain or to
cause financial loss to someone else. *Proving intent to
deceive alone, meaning deception without the intent to
cause loss or injury, is not sufficient to prove intent to de-
fraud. And merely inducing someone, by means of trick or
deceit, to enter a transaction that he or she otherwise
would have avoided is insufficient to show fraud. It is not fraud if
a Defendant or the Defendants tricked someone into enter-
ing a transaction but nevertheless gave the person exactly
what they asked for and charged that person exactly what
he or she agreed to pay.*

The district court rejected the proposal and instead used the
pattern jury instructions. It instructed that "[a] 'scheme to defraud'
includes any plan or course of action intended to deceive or cheat
someone out of money or property using false or fraudulent pre-
tenses, representations, or promises," and that "[t]o act with 'intent
to defraud' means to act knowingly and with the specific intent to
deceive or cheat someone, usually for personal financial gain or to
cause financial loss to someone else." *See* Eleventh Circuit Pattern
Jury Instructions, Criminal Cases O50.1, at 322–23 (Apr. 2016 ed.).
Rhame and Bell also requested an instruction on the false state-
ment counts that if "something is ambiguous, it's the government's
burden to clear up that ambiguity." The district court also denied
that request.

The jury convicted Rhame, Shaw, and Bell on all remaining
counts of fraud conspiracy, mail fraud, wire fraud, and false

statements. The jury acquitted the defendants of the money laundering and related conspiracy counts, and it acquitted Keller of all charges. Rhame, Shaw, and Bell moved for a new trial and for judgments of acquittal. The district court denied the motions. As those posttrial motions were pending, the Judicial Council for the Eleventh Circuit amended the pattern jury instructions to add language similar to the first sentence of the sellers' proposed fraud instruction. *See* Eleventh Circuit Pattern Jury Instructions, Criminal Cases O50.1, at 2 (Jan. 2019 rev.).

At sentencing, Rhame submitted over 60 letters attesting to his character, military service, and history of charitable deeds. After a weeklong sentencing hearing, the district court imposed within- or below-guidelines sentences for Rhame, Shaw, and Bell, of 180, 95, and 84 months in prison, respectively. The district court applied a sophisticated-means enhancement and a substantial-financial-hardship enhancement to Rhame's offense-level calculation, and it did not grant a downward departure based on Rhame's military service. The district court also applied an obstruction-of-justice enhancement based on Rhame's false testimony during a suppression hearing. Rhame had testified, in an effort to suppress his statements to federal agents, that an agent had directed him to end a call with his attorney. The district court made a credibility determination, based on the agent's contrary testimony, that Rhame had committed perjury.

## II. STANDARDS OF REVIEW

We review *de novo* the sufficiency of the evidence. *United States v. Watkins*, 42 F.4th 1278, 1282 (11th Cir. 2022). We interpret trial evidence in the light most favorable to the verdict and will not disturb the verdict "unless no trier of fact could have found guilt beyond a reasonable doubt." *Id.* (citation and internal quotation marks omitted). The evidence need not "exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt." *United States v. Williams*, 390 F.3d 1319, 1323–24 (11th Cir. 2004) (citation and internal quotation marks omitted).

We also review *de novo* the legal correctness of a jury instruction. *United States v. Prather*, 205 F.3d 1265, 1270 (11th Cir. 2000). If the given instruction correctly states the law, we review for an abuse of discretion the refusal to give a supplemental requested instruction. *See Watkins*, 42 F.4th at 1282.

We review evidentiary rulings for an abuse of discretion. *Id.*

We review *de novo* the application of the Sentencing Guidelines. *United States v. Perez*, 943 F.3d 1329, 1332 (11th Cir. 2019). We lack jurisdiction to review the denial of a downward departure from the Sentencing Guidelines unless the district court incorrectly concluded that it had no authority to depart. *United States v. Dudley*, 463 F.3d 1221, 1228 (11th Cir. 2006). We review for clear error the factual findings that support a sentencing enhancement. *United States v. Presendieu*, 880 F.3d 1228, 1248 n.12 (11th Cir. 2018). We also review for plain error a constitutional objection to a

sentencing enhancement raised for the first time on appeal. *United States v. Maurya*, 25 F.4th 829, 836 (11th Cir. 2022).

## III. DISCUSSION

We divide our discussion into six parts. First, we reject the sellers' arguments that the evidence does not support their fraud convictions. Second, we explain that the district court correctly instructed the jury on those counts. Third, we reject Rhame's and Bell's arguments that the evidence did not support their false statement convictions. Fourth, we explain that the district court correctly instructed the jury on those counts. Fifth, we explain that the district court did not commit evidentiary errors that warrant a new trial. Sixth, we explain that the district court did not err when it sentenced Rhame.

### A. Evidence Supports the Fraud Convictions.

The sellers argue that the evidence is insufficient to support their mail fraud, wire fraud, and fraud conspiracy convictions for three reasons. First, the sellers argue that the government's theory of fraud fails under *Takhalov*. Second, the sellers argue that the prosecution failed to prove that the sellers had lied about the revaluation or the airport plan. Third, on the conspiracy charge, the sellers argue that the prosecution failed to prove that the sellers agreed to commit an illegal act. We explain in turn why each challenge fails.

1. The Sellers' Misrepresentations Prove Their Intent to Defraud.

The sellers argue that because investors "received exactly [the dinar] they paid for," the prosecution's theory of fraud fails as a matter of law under *Takhalov*, 827 F.3d at 1315 (internal quotation marks and citation omitted). We disagree. This argument misunderstands our precedents.

To prove mail or wire fraud, the government must prove that the sellers intentionally participated in a "scheme or artifice to defraud." 18 U.S.C. §§ 1341, 1343. The federal fraud statutes prohibit "deceptive schemes to deprive the victim of money or property." *Kelly v. United States*, 140 S. Ct. 1565, 1571 (2020) (alterations adopted) (citation and internal quotation marks omitted). To prove an intent to defraud, the government must prove that the sellers either knew that they were making false statements or were acting with reckless indifference to the truth. *United States v. Wheeler*, 16 F.4th 805, 819 (11th Cir. 2021).

Intent to defraud also requires the intent to *harm* victims by misrepresenting "the value of the bargain." *Id*. The deception must go to the "nature of the bargain itself"—an ancillary lie will not suffice. *Takhalov*, 827 F.3d at 1314. A deception is illegal when a fraudster creates a "discrepancy between benefits reasonably anticipated because of the misleading representations" and what the fraudster delivered. *Id*. (quoting *United States v. Starr*, 816 F.2d 94, 98 (2d Cir. 1987)). We explained in *Takhalov* that the "two *primary* forms" of fraudulent deception are when a fraudster lies about the price or

about the characteristics of what he is selling. *Id.* at 1313–14 (emphasis added).

The "characteristics" of a good are not narrowly limited to its physical properties or authenticity. Whether a given characteristic affects a good's pecuniary value to the buyer, and figures materially into the bargain, is highly contextual. *See Neder v. United States*, 527 U.S. 1, 22 n.5 (1999) ("[A misrepresentation] is material if . . .'a reasonable man would attach importance to its existence or nonexistence in determining his choice of action in the transaction in question.'" (quoting Restatement (Second) of Torts § 538 (Am. L. Inst. 1977)). Indeed, the test for a material deception "cannot be stated in the form of any definite rule, but must depend upon the circumstances of the transaction itself." *United States v. Feldman*, 931 F.3d 1245, 1272 (11th Cir. 2019) (W. Pryor, J., concurring) (quoting *Prosser and Keeton on Torts* § 108, at 753 (5th ed. 1984)).

A deception need not have a calculable price difference or result in a different tangible good or service being received to constitute fraud. In *United States v. Dynalectric Co.*, for example, we explained that contractors' bid-rigging scheme for government contracts could sustain a federal fraud conviction even if the scheme had not "cost the [government] or anyone else one red cent." 859 F.2d 1559, 1576 (11th Cir. 1988) (citation and internal quotation marks omitted). We held that the contractors' lies—that their bids stemmed from competition instead of collusion—proved their fraudulent *intent*, even if they ultimately performed the agreed-upon services at a fair bid price. *Id.* at 1562, 1576; *see Feldman*,

931 F.3d at 1271 (W. Pryor, J., concurring) ("The gravamen of the scheme to defraud, in other words, was not any misrepresentation about 'the price' or 'the characteristics of' the bargained-for work." (quoting *Takhalov*, 827 F.3d at 1314)). Likewise, in *Wheeler*, we held that stock-sellers who had concealed how much they received in commissions, and who had misled investors about a stock's potential listing on a major exchange and association with a prominent technology company, had the requisite intent to defraud. *See* 16 F.4th at 820–21. That the price impact was indeterminate and that investors had "got the number of shares they bargained for at the price they bargained for" did not vitiate the stock-sellers' fraudulent intent. *Id.* at 816. And in *Watkins*, we held that a bank borrower's misrepresentations as to the true recipient of a loan went to the "very nature" of the bargain and so supported a bank fraud conviction. *See* 42 F.4th at 1286–87.

A jury could reasonably have found that Rhame, Shaw, and Bell deceived investors about a core attribute of the dinar: the odds of its appreciation. Investors were led to believe that their dinars would imminently skyrocket in value. That high probability of profit was an essential characteristic of the asset that investors thought they were purchasing. *See Takhalov*, 827 F.3d at 1314. It was *the* reason many made the purchase.

As the government explains, the sellers' fraud was no different from a lottery scam. If a customer buys a $10 lottery ticket because he is promised a one-in-ten chance of winning the jackpot, he has been defrauded if his actual odds of winning are one-in-a-

million. The customer's out-of-pocket loss might be zero—he wanted a $10 lottery ticket, and he received a $10 lottery ticket— but he has still been duped. He has suffered a pecuniary loss if he would not have paid $10 knowing his true odds. Just as the lottery fraudster is culpable for misleading customers about the odds of the jackpot, the sellers are culpable for falsehoods about the revaluation. And that the dinar's exchange rate was set by the Iraqi government does not mean that investors got "exactly what they paid for." Sterling charged exchange fees that were baked into the dinar price, and investors paid fees under the illusion that the revaluation would compensate them.

The record also establishes that the sellers' lies about the airport kiosks went to the core of the bargain with investors. The lies were not "ancillary" when investors chose to buy from Sterling *because of* its promised airport exchanges. One investor testified, for example, that the promised kiosks provided crucial assurance that secure exchange facilities would be available after the revaluation.

The wide geographic availability of airport kiosks was a service, tethered to the dinars, that Sterling promised to investors. If a car dealer falsely promised roadside assistance to customers and the promises materially influenced customers to buy from that dealer, the falsehoods would be actionable fraud. So too are the sellers' false promises of airport exchange services—even if the investors did not later need to use the exchange service. *See Shaw v. United States*, 137 S. Ct. 462, 467 (2016) (mail fraud is actionable "even if [victims] ultimately did not suffer unreimbursed loss").

Because a reasonable jury could have found that the sellers' lies about the revaluation and airport plan went to the nature of the bargain, those lies may prove the sellers' intent to defraud.

We have never held that the federal fraud statutes are categorically inapplicable to fraudulent inducement schemes. The sellers argue that misrepresentations that "simply influence[]" a counterparty to transact cannot constitute actionable fraud. Although "merely" establishing that a fraudster "induced the victim to enter into a transaction that he otherwise would have avoided" cannot prove fraudulent intent, *see Takhalov*, 827 F.3d at 1310 (alterations adopted) (citation and internal quotation marks omitted), *material* inducements may still be actionable fraud. Our precedents establish that fraudulent inducements about a collateral but still material matter are punishable under the federal statutes. *See Dynalectric Co.*, 859 F.2d at 1576; *Watkins*, 42 F.4th at 1286–87; *see also Feldman*, 931 F.3d at 1270 (W. Pryor, J., concurring). To be clear, the inducement scheme's perpetrators must still intend the deprivation of a victim's money or property. *See Wheeler*, 16 F.4th at 819. But both fraud-in-the-factum and fraudulent inducement schemes fit "squarely within the 'well-settled meaning' of 'actionable "fraud."'" *Feldman*, 931 F.3d at 1271 (W. Pryor, J., concurring) (quoting *Neder*, 527 U.S. at 22).

### 2. Evidence Proves that the Sellers Misled Investors About the Revaluation and the Airport Plan.

The sellers argue that the evidence was insufficient to prove that they misled investors about an imminent revaluation or lied

about the airport plan. We will not overturn a jury verdict for lack of evidence unless no reasonable construction of the facts would allow a finding of guilt beyond a reasonable doubt. *Wheeler*, 16 F.4th at 819. A split verdict is further "evidence that the jury considered the charges carefully and individually, addressed the strength of the evidence on each charge, and reached a reasoned conclusion." *United States v. Siegelman*, 640 F.3d 1159, 1180 (11th Cir. 2011). And because the sellers' convictions were predicated on a conspiracy, Rhame, Shaw, and Bell are guilty if the evidence establishes that their coconspirators made misrepresentations in support of the conspiracy. *See Watkins*, 42 F.4th at 1284 ("[A] defendant may be convicted of [wire] fraud without personally committing each and every element of . . .[wire] fraud, so long as the defendant knowingly and willingly joined the criminal scheme." (second alternation in the original) (citation and internal quotation marks omitted)). The sellers' burden in challenging the sufficiency of the evidence is heavy, and they fail to meet it.

The record is replete with evidence that the sellers made false assurances about an imminent dinar revaluation, both directly and through the GET Team, despite their disbelief in the rumors. Examples of the sellers' misrepresentations are extensive, from Rhame's web article predicting a "sudden significant[] (overnight/over weekend) high revaluation," to Rhame's appearance in promotional videos, to Sterling's continued payments to Keller despite the sellers' knowledge that Keller was making false predictions and lying about his inside sources. The sellers promoted the dinar and encouraged Keller's propaganda despite believing the

revaluation to be "mythology." Indeed, Shaw emailed Rhame to express concerns that he did not want "to risk everything based on [Rhame's] belief . . . that the Iraqi dinar will not [revalue]" and that he did not think "it is ok to make millions of dollars in false promises to our customers." That the rumors were purportedly a "prediction" about future events does not excuse the sellers: a jury may find "[d]eclarations of opinion as to future events which the declarant does not in fact hold" to be fraudulent. *United States v. Amrep Corp.*, 560 F.2d 539, 543 (2d Cir. 1977).

The evidence that the sellers lied about the airport plan is even stronger. In addition to the promises posted on the Sterling website that touted the company's ability to open satellite offices within hours or days of a revaluation, Rhame also directly emailed individual investors with assurances that Sterling had plans to operate at airports in Miami, New York, Dallas, and almost a dozen other cities. But Sterling had neither the plans nor the ability to open physical exchanges. Sterling employees testified that they had never seen any operational, training, or personnel materials related to any airport plan, and did not know of any employees capable of staffing the exchanges. Likewise, multiple airport representatives testified that Sterling never applied for the licenses necessary to operate as a currency exchange.

Last, we reject Shaw's argument that there was insufficient evidence that he participated in the fraud because he did not personally make any misrepresentations to investors. As Sterling's co-owner and bankroller, Shaw argues that he was merely a "big-

picture investor with no involvement in day-to-day operations." But Shaw can be convicted even if his participation in the conspiracy was "slight" compared to his coconspirators'. *See Watkins*, 42 F.4th at 1285 (citation and internal quotation marks omitted). And the government may prove the elements of conspiracy and Shaw's participation "by circumstantial evidence." *See United States v. Moran*, 778 F.3d 942, 960 (11th Cir. 2015).

A jury could reasonably have found that Shaw knowingly participated in the fraudulent scheme. The record reflects that Shaw bankrolled Sterling's finances, was "instrumental" in managing Sterling's website where fraudulent promises were posted, understood that dinar promoters were driving Sterling's sales, and knew that Sterling was promising investors that they could "exchange anywhere in the world within 12 hours of any revaluation." Indeed, in an email to Rhame, Shaw voiced concerns about Sterling's legality:

> The point is that [my wife] and I have worked way too hard in life for us to risk everything based on your belief (even if I agree with you) that the Iraqi dinar will not [revalue] and it is ok to make millions of dollars in false promises to our customers. Not only are we risking everything we own, we are risking serious jail time as promoters of a ponzi scheme.

In another email, he raised concerns about stoking investors' unrealistic expectations:

> [My wife] and I are concerned about getting letters to you thanking you for helping them with their hospital

with their purchase of $20k for a $200k layaway and other similar letters. We are not Charlatans and I do not like making money under false pretenses . . . Our life is happy without swindling people.

This evidence is sufficient to prove Shaw's involvement. The jury could have reasonably found that all the sellers defrauded investors by misleading them about the likelihood of revaluation and the airport plan.

### 3. Evidence Proves that the Sellers Agreed to Commit an Illegal Act.

The sellers argue that the evidence is insufficient to prove that they agreed to commit an illegal act. We disagree. The government may prove agreement to join a conspiracy by inferences drawn from conspirators' conduct or by circumstantial evidence. *United States v. Gonzalez*, 834 F.3d 1206, 1214 (11th Cir. 2016).

The record is replete with both direct and circumstantial evidence that the sellers agreed with each other and with Keller fraudulently to promote Sterling's sales. There are extensive email communications. In one example, Rhame bragged, when he emailed Shaw his article predicting an imminent revaluation, that "this should get some people excited." In another, Shaw emailed Rhame that his wife was "was crying last night because she knows we are running an illegal operation." And Sterling's secret payments to Keller provide further evidence of culpable conduct. Keller repeatedly emailed the sellers to tout that his false revaluation rumors had "sent a butt load of customers to [Sterling's] site"; that he had

generated a "ton of orders"; and "[Sterling is] the group [he was] pushing behind the picture." A jury could reasonably have found that the sellers agreed with each other and with Keller to sell dinars based on fraudulent representations.

B. *The District Court Properly Instructed the Jury on the Fraud Charges.*

The sellers argue that the district court erred by failing to give a *Takhalov* instruction on the fraud charges. We again disagree. The district court correctly instructed the jury.

The parties dispute the standard of review. Shaw argues that we should review the jury instructions *de novo* because the instructions misstated the law by omitting the sellers' proposed language. The government responds that we should review for abuse of discretion.

We review for an abuse of discretion. The pattern jury instructions given by the district court contained no errors. But the sellers argue that additional instructions were needed to fully communicate the elements of fraud. We have consistently reviewed similar challenges for an abuse of discretion post-*Takhalov*. *See Watkins*, 42 F.4th at 1287 (refusal to give *Takhalov* instruction in a wire and bank fraud case); *United States v. Waters*, 937 F.3d 1344, 1353 (11th Cir. 2019) (same in wire fraud case).

The sellers proposed jury instructions that they said reflected the distinction that we drew in *Takhalov* between the intent to deceive and the intent to defraud. *See* 827 F.3d at 1313–14. The sellers proposed that the jury be instructed that "[p]roving intent to deceive alone, meaning deception without the intent to cause

loss or injury, is not sufficient to prove intent to defraud." That language has since been incorporated into the Eleventh Circuit Pattern jury instructions. *See* Eleventh Circuit Pattern Jury Instructions, Criminal Cases O50.1, at 2 (Jan. 2019 rev.). The sellers also proposed the instruction that "[i]t is not fraud if" the sellers "tricked someone into entering a transaction but nevertheless gave the person exactly what they asked for and charged that person exactly what he or she agreed to pay." The Judicial Council has not adopted that language.

To prove reversible error, the sellers must establish that the requested jury instruction "(1) was a correct statement of the law; (2) was not adequately covered in the instructions given to the jury; (3) concerned an issue so substantive that its omission impaired the accused's ability to present a defense; and (4) dealt with an issue properly before the jury." *United States v. Westry*, 524 F.3d 1198, 1216 (11th Cir. 2008) (citation and internal quotation marks omitted). To be a correct statement of law, an instruction must be complete and not misleading. *United States v. Silverman*, 745 F.2d 1386, 1396 (11th Cir. 1984). We reverse "only if we are left with a substantial, ineradicable doubt as to whether the jury was properly guided in its deliberations." *United States v. Dohan*, 508 F.3d 989, 993 (11th Cir. 2007).

The district court did not abuse its discretion by refusing to give the sellers' proposed instruction. Most of the instruction—that is, that "[i]t is not fraud if" the sellers "tricked someone into entering a transaction but nevertheless gave the person exactly what

they asked for"—is an incomplete statement of the law and risked misleading the jury. *See Silverman*, 745 F.3d at 1396. That language presents only the sellers' theory of the case. The government posited that the sellers' misrepresentations did go to the "characteristics" of the dinar and so constituted actionable fraud, *see Takhalov*, 827 F.3d at 1314, but the defense posited that the misrepresentations were ancillary when investors received "exactly [the dinars] they asked for." By merely restating the sellers' defense theory, the proposed instruction was one-sided. It presented only a scenario that would not be fraud, while omitting scenarios that would be fraud, and so failed to instruct the jury how to tell the difference. We have affirmed the refusal to give supplemental instructions— "[t]hough composed of quotations from our opinion in *Takhalov*"—in a similar context because pairing the instructions with only the defense theory risked misleading the jury. *See Waters*, 937 F.3d at 1353 (affirming refusal of proposed *Tahkalov* instruction that was an "incomplete statement of the law" and "didn't tell the jurors how to tell the difference" between deceit and fraud (citation and internal quotation marks omitted)).

Nor did the omission of the instruction impair the sellers' ability to present a complete defense. *See Westry*, 524 F.3d at 1216; *United States v. Eckhardt*, 466 F.3d 938, 947–48 (11th Cir. 2006). The part of the sellers' instruction now incorporated into the current version of the Eleventh Circuit pattern jury instructions—that is, that "[p]roving intent to deceive alone, meaning deception without the intent to cause loss or injury, is not sufficient to prove intent to defraud" was substantively incorporated in the district court's jury

charge. The instruction that the district court gave explained that a "'scheme to defraud' includes any plan or course of action *intended* to deceive or cheat someone out of *money or property*." So when viewed as a whole, the district court's instruction made clear that the defendant must intend "to deceive the [victim] *and* deprive [him] of something of value." *Shaw*, 580 U.S. at 63. Because the district court's charge "addressed the substance" of the first sentence of the sellers' proposed instruction, the sellers' "ability to present an effective defense was [not] impaired." *Watkins*, 42 F.4th at 1287. The district court did not abuse its discretion when it refused to give the sellers' proposed instruction.

### C. Evidence Supports Rhame's and Bell's False Statements Convictions.

Rhame and Bell argue that their convictions for false statements to federal agents cannot stand. They argue that the government failed to prove the falsity of their statements and that their statements were fundamentally ambiguous. We disagree.

To sustain the convictions for false statements, the prosecution must prove that the sellers made statements that were both false and material, that they had specific intent, and that the statements were within the jurisdiction of an agency of the United States. *United States v. Boffil-Rivera*, 607 F.3d 736, 740 (11th Cir. 2010). An answer to a line of *questioning* that is "fundamentally ambiguous" might be "insufficient as a matter of law" to support a conviction. *United States v. Manapat*, 928 F.2d 1097, 1099 (11th Cir. 1991) (citation and internal quotation marks omitted).

Sufficient evidence supported Rhame's four convictions for false statements. First, Rhame was charged for falsely stating that "he and Sterling had never advertised the Iraqi dinar as a good investment." In response to an agent's question, "[Y]ou've never—you personally or on your website or anything like that have ever . . . promot[ed] [the dinar] as a good investment," Rhame responded, "Hell, no. . . . Never. You will never find that anywhere." That statement is contradicted by a Sterling promotional video in which Rhame asserted that "the Iraqi dinar stands alone as one of the most promising investments today."

Second, Rhame was charged for falsely stating that "he and Sterling had never promoted and talked about a potential Iraqi dinar revaluation." Rhame and a federal agent had the following exchange:

> Agent: Along the lines of you don't promote the dinar as an investment, have you ever promoted or talked about on your website the RV or the revaluation?
>
> Rhame: Never.
>
> Agent: Okay.
>
> Rhame: You'll never find it anywhere.
>
> Agent: Okay.
>
> Rhame: Because that's not—it's not our job. It's not our place and—absolutely not.

That exchange is contradicted by Rhame's statements in Sterling promotional videos and his article on the Sterling website, titled "Iraqi Dinar Revaluation," in which he asserted that "sudden

significant[] (overnight/over weekend) high revaluation seems very possible."

Third, Rhame was charged for falsely stating that "he and Sterling had never paid commissions to third parties to promote Iraqi dinar sales." Rhame asserted, in an evasive and roundabout answer, that "our advertising, as a matter of fact we've had—I know we've had people in the past say, well, . . . I don't think we deal with anything like that at all anymore, but anybody that's ever said, hey, . . . we want to be paid based off how much, you know, currency we sell." An agent interjected, "Like a commission?" Rhame responded, "No. . . . No eff-ing way." Rhame's denial is contradicted by, for example, emails that discuss paying "a 2% sales commission" to a "campaign [that] will promote the purchase of Iraqi dinars," and emails offering to pay a promoter "$10 per referral" for sales.

Fourth, Rhame was charged for falsely stating that "he and Sterling had never incentivized other blogs and websites to promote Sterling's dinar sales." Rhame denied incentivizing promoters in the following exchange with an agent:

> Rhame: We do not promote anything. And we don't—and we don't incentivize anybody else to do it, just so you're—so we're crystal clear. We don't incentivize any—you know, if we advertise with somebody, there's no way in a million years we incentivized them to do that or anything else like that.
>
> . . .

> [M]y understanding is that if we have any advertise-
> ments anywhere on—on a website, it's strictly, you
> know, a posting of a banner.
>
> . . .
>
> Agent: So you're not—you're not aware of any—pay-
> ing anybody on another blog or website like that to
> promote—
>
> Rhame: I'll tell you. Hell, no. No way.
>
> Agent: Okay.
>
> Rhame: We don't do that.
>
> Agent: Okay.
>
> Rhame: Not in a million years.
>
> Agent: Okay.
>
> Rhame: No, we just don't do it.

Those statements are contradicted by Sterling's $4,000-per-
month payments to Keller, who boasted that he had "been pump-
ing the heck out of you guys [Sterling] on [his] site."

Sufficient evidence also supports Bell's two convictions for
false statements. First, he was charged with falsely stating that "he
and Sterling maintained a 'firewall' with Iraqi dinar promoters" and
that "he affirmatively told promoters 'not to drive business' to Ster-
ling's website." Second, Bell was charged with stating that he had
"told [Keller] not to promote Sterling." In his second interview,
agents asked Bell about the "firewall" comment from his first inter-
view. An agent referenced an email between Keller and Bell in

which Keller "indicates he's e-mailing you discussing that he's . . . promoted Sterling in the chat rooms." The agent stated that "[the email] kind of goes to my concern of—of, you know, you spoke of that firewall that you tried to keep . . . but then the promoters are sending direct messages [to you] about kind of what they're doing in these chat rooms to direct business to Sterling." Bell replied, "I've told him [Keller] I don't want him doing it and I don't want to hear about it." Bell's statements that he "maintained a firewall" and told promoters, Keller included, not to drive business to Sterling are contradicted by his many emails encouraging Keller's promotion of Sterling. In one exchange, for example, Keller boasted, "I have a ton of peeps cashing in with you guys," and Bell responded, "That is terrific. Thanks for having me on the call." In another, Rhame emailed Bell, "We generally take care of [Keller] because he sends a lot of business our way."

Rhame and Bell's argument that their convictions cannot stand because their statements were ambiguous also fails. Our precedents preclude only prosecutions "based on fundamentally ambiguous *questions*." *E.g.*, *Manapat*, 928 F.2d at 1100 (emphasis added). "Precise *questioning* is imperative as a predicate" for criminal offenses based on perjury, *Bronston v. United States*, 409 U.S. 352, 362 (1973) (emphasis added), because of the "unfairness" of convicting a defendant when "the questions forming the basis of the charge are . . . vaguely and inarticulately phrased *by the interrogator*," *Manapat*, 928 F.2d at 1099 (citation and internal quotation marks omitted). The distinction between ambiguous questions and ambiguous answers is crucial: a criminal defendant escapes a

perjury charge only if the federal agents asked an ambiguous question; he cannot wriggle out of the same charge through an evasive answer. Rhame and Bell's argument, premised on the ambiguity of their answers, fails as a matter of law.

There was nothing "fundamentally ambiguous" about Rhame's and Bell's statements or the agents' questions. The prosecution offered ample evidence to prove the falsity of the defendants' statements. And the agents' questions, when viewed in the conversations' context, are clear. The jury could have reasonably found, based on Rhame and Bell's answers, that they lied to federal agents.

### D. The District Court Properly Instructed the Jury on the False Statement Charges.

Rhame argues that the district court abused its discretion by refusing a proposed supplemental instruction on ambiguity. The sellers objected to the false statement pattern instructions at the charge hearing and requested an instruction reflecting the "clear case law that says that [if] something is ambiguous, it's the government's burden to clear up that ambiguity." Their proposed instruction added that "[t]he Government bears the burden of negating all literally truthful interpretations of a statement when the statement is ambiguous and subject to multiple interpretations" to the pattern instructions. The district court denied the request and used the pattern instructions for each false statement count. Denial of a proposed instruction is reversible error only if the proposal is "a

correct statement of the law." *Westry*, 524 F.3d at 1216 (citation and internal quotation marks omitted).

Rhame's requested instruction failed to provide a correct statement of the law. A federal agent need not negate all ambiguity in an interviewee's answer to sustain a false statement conviction; the agent is responsible only for asking unambiguous questions. *See Manapat*, 928 F.2d at 1099–1100; *see also Bronston*, 409 U.S. at 362. So the district court did not abuse its discretion when it omitted Rhame's ambiguity instruction.

### E. No Evidentiary Error Warrants a New Trial.

The sellers argue that the district court committed three evidentiary errors that individually and cumulatively warrant a new trial. First, the sellers object to the admission of news reports and press releases that dinar sales were a scam. The government offered the evidence to prove that the sellers were on notice that their conduct was illegal. Second, the sellers object because the prosecution called fraud victims to read aloud from previously admitted exhibits, about which the victims had no personal knowledge. Third, Rhame objects to the inclusion of evidence of his wealth and exclusion of evidence of his charitable donations. We reject each challenge in turn.

### 1. The Media Reports and Press Releases Were Not Hearsay or Unduly Prejudicial.

The sellers object that the admission of various media reports, press releases, and emails—all of which warned that dinar sales were a scam—were inadmissible hearsay and prejudicial. The

challenged evidence includes a CNBC news video about convicted dinar seller Brad Huebner; a Forbes articled titled "You Can't Fix Stupid: The Iraqi Dinar Scam Lives"; a warning post from a blogger pseudonymously named "Nutrition Dude"; a purported Bank of America notice condemning the "Iraqi dinar scam"; and an email informing the sellers that a customer's bank refused to wire Sterling money for the dinar "scam." The sellers emailed links or attachments of the media exhibits to each other. The emails included concerned comments about the exhibits' contents, for example, "[t]his isn't good," and "not [a] great article." The district court admitted the video, the Bank of America warning, the emails, and the news articles with limiting instructions.

The sellers erroneously argue that the article and warnings were inadmissible hearsay. Hearsay is a statement, other than one made by the individual testifying at trial, offered to prove the truth of the matter asserted. FED. R. EVID. 801(c). Evidence admitted to prove the listener's state of mind is not hearsay. *United States v. Schlei*, 122 F.3d 944, 981 (11th Cir. 1997). The district court admitted the news reports, emails, and articles as proof that the sellers were on notice of the wrongfulness of their conduct and of the fact that other individuals had been prosecuted for similar behavior. The evidence was not inadmissible hearsay. *See id.*

The sellers also argue that the reports, emails, and articles were unduly prejudicial and had limited probative value. *See* FED. R. EVID. 403. According to the sellers, media sources could not show the sellers' awareness of their wrongful conduct when the

sellers correctly understood the act of selling dinars to be legal. Federal Rule of Evidence 403 provides that the district court has discretion to exclude otherwise relevant evidence if its probative value is substantially outweighed by the danger of unfair prejudice. Exclusion under that rule "is an extraordinary remedy" that the district court "should invoke sparingly, and the balance should be struck in favor of admissibility." *United States v. Lopez*, 649 F.3d 1222, 1247 (11th Cir. 2011) (citation and internal quotation marks omitted). And a limiting instruction mitigates the risk of undue prejudice. *United States v. Ramirez*, 426 F.3d 1344, 1354 (11th Cir. 2005). We must presume, in absence of contrary evidence, that the jury followed limiting instructions. *Id.* at 1352.

The district court did not abuse its discretion in admitting the media reports and press releases with limiting instructions. We presume that the jury followed the district court's instructions that the news articles could "not be considered for the truth of any of the matters asserted," and that reports of other dinar sellers' conduct "may have no bearing on what happened in [Sterling's] case or resemble the facts of [Sterling's] case." Nor can we say that the media reports were unfairly prejudicial in the light of the immense body of evidence—20 witnesses and nearly 300 other exhibits—introduced over nearly five weeks of trial. Indeed, the sellers' own communications characterized their business as an "illegal operation" and a "ponzi scheme." The district court did not commit reversible error when it admitted the evidence.

2. The District Court Did Not Abuse Its Discretion When
It Permitted Sterling Investors to Read Aloud
from Previously Admitted Exhibits.

Rhame objects that the prosecution repeatedly called witnesses to read from exhibits about which they had no personal knowledge. He cites no rule or precedent to support his argument, but only highlights that the district court worried that the procedure might be "appealable." The prosecution called multiple Sterling investors—that is, fraud victims—to read aloud from particularly damaging exhibits of the sellers' emails and other communications. The parties had stipulated before trial to the authenticity of those exhibits. Rhame cites no authority for the proposition that witnesses cannot read from authenticated, previously admitted evidence. And our precedents say that they can do so. *See United States v. Willner*, 795 F.3d 1297, 1318 n.17 (11th Cir. 2015) ("Anyone can state what a document says or read from it if it has been admitted into evidence, and permitting this testimony was not error."). The district court did not abuse its discretion.

3. The District Court Properly Included Evidence
of Rhame's Wealth and Excluded Evidence
of His Charitable Donations.

The district court did not abuse its discretion when it admitted evidence of Rhame's lavish lifestyle and excluded evidence of his charitable donations. Rhame's lifestyle expenditures and accompanying photographs were admissible to prove his motive for fraud. *United States v. Bradley*, 644 F.3d 1213, 1272 (11th Cir. 2011)

("The district court had broad discretion to admit the Government's 'wealth evidence' so long as it aided in proving or disproving a fact in issue."); *see also United States v. Hill*, 643 F.3d 807, 843 (11th Cir. 2011) ("[W]ith financial crimes, the more money, the more motive."). And his charitable donations were inadmissible character evidence. *See United States v. Langford*, 647 F.3d 1309, 1329 (11th Cir. 2011) (defendant's donations were inadmissible character evidence).

*F. The District Court Lawfully Sentenced Rhame.*

Rhame argues that the district court erred at sentencing in four ways: first, it should have granted a downward departure based on his military service; second, it erred by applying a sophisticated-means enhancement; third, it erred by applying an obstruction-of-justice enhancement; and fourth, it plainly erred by applying a substantial-financial-hardship enhancement. We address each argument in turn.

First, we lack jurisdiction to review the refusal to grant Rhame a downward departure under section 5H1.11 of the Sentencing Guidelines. *See* United States Sentencing Guidelines Manual § 5H1.11 (Nov. 2023). At the sentencing hearing, the district court entertained and then denied Rhame's motion for a section 5H1.11 downward departure based on his 32-year service career in the Air Force. "We lack jurisdiction to review a district court's decision to deny a downward departure unless the district court incorrectly believed that it lacked authority to grant the departure." *Dudley*, 463 F.3d at 1228. Absent contrary evidence, we

assume that the district court understood that it had authority to depart downward. *Id.* Rhame does not argue that the district court believed that it lacked authority to grant the departure; he instead argues that the district court failed to consider the length and meritorious nature of his service. Because nothing in the record suggests that the district court thought it lacked authority, we lack jurisdiction over this issue and must dismiss.

Second, the district court did not err by applying the two-level sophisticated-means enhancement in connection with the fraud charges. *See* U.S.S.G. § 2B1.1(b)(10)(C). The guidelines define "sophisticated means" as "especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense." *Id.* § 2B1.1 cmt. n.9(B). We have affirmed application of the enhancement when a criminal scheme "involved repetitive and coordinated activities by numerous individuals who used sophisticated technology to perpetrate and attempt to conceal the scheme." *United States v. Barrington*, 648 F.3d 1178, 1199 (11th Cir. 2011). A district court may apply the enhancement when only "some—but not all—aspects of a scheme are sophisticated." *Wheeler*, 16 F.4th at 830. The district court found that the sellers' scheme involved "repetitive coordinated activities and sophisticated technologies" to perpetrate fraud, and that Rhame "was an organizer and leader of the criminal activity." Those findings are supported by the record and sufficient to support the application of the enhancement.

Third, the district court did not err when it applied the two-level obstruction-of-justice enhancement based on Rhame's perjury during a suppression hearing. *See* U.S.S.G. § 3C1.1. A district court may apply the enhancement if a defendant "willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing" of his offense of conviction. *Id.* § 3C1.1(1). The district court imposed the enhancement after it found that Rhame had "testified falsely" under oath during the suppression hearing, that the testimony was material, and that the falsity "was not based on mistake, confusion[,] or faulty memory." Rhame's false testimony was an effort to suppress, because of alleged *Miranda* violations, his statements during his interview with federal agents. Rhame testified that during the interview, an agent had "ma[de] [him] get off the phone" during a call with his attorney. An agent testified that Rhame had "hung up the phone on his own."

When, as here, an officer's testimony directly conflicts with a defendant's, "[c]redibility determinations are typically the province of the fact finder." *United States v. Ramirez-Chilel*, 289 F.3d 744, 749 (11th Cir. 2002). We defer to the district court unless its "understanding of the facts appears to be unbelievable." *Id.* (citation and internal quotation marks omitted). The district court found the agents credible and found that the testimony and later behavior of Rhame's attorney "simply d[id] not support" Rhame's testimony that the agents had forced him to end the call. That credibility determination is not unbelievable, and the district court did not

clearly err by applying an obstruction enhancement based on Rhame's perjury.

Fourth, the district court did not plainly err when it applied the six-level substantial-financial-hardship enhancement. *See* U.S.S.G. § 2B1.1(b)(2)(C) (providing a six-level increase for causing substantial financial hardship to 25 or more victims). Rhame argues that applying the substantial-financial-hardship enhancement violated the Ex Post Facto Clause, *see* U.S. CONST. art. 1, § 9, cl. 3, because the enhancement did not exist at the time of his offense in 2015. The Ex Post Facto Clause bars a defendant from being sentenced under a version of the guidelines that would provide a *higher* sentencing range than the version in place at the time of his criminal conduct. *Peugh v. United States*, 569 U.S. 530, 533 (2013). We determine the relevant comparator range by looking at the entire manual in effect at the time of the conduct. *See United States v. Bailey*, 123 F.3d 1381, 1403–04 (11th Cir. 1997). Because Rhame did not raise this issue before the district court, we review it only for plain error. *See Maurya*, 25 F.4th at 836.

Rhame cannot prove that he would have been clearly entitled to a lower sentencing range under the comparator 2014 manual. To be sure, the 2014 manual did not include a substantial-financial-hardship enhancement, but it *did* include a general victim-impact enhancement that would have applied to Rhame. The 2014 manual provided that an offense involving 50 or more victims triggered a four-level increase, and an offense involving 250 or more victims triggered a six-level increase. U.S.S.G. § 2B1.1(b)(2)(B)–(C)

(2014). The Sentencing Commission amended the guidelines in November 2015, after Sterling ceased operations, to add the hardship component but lower the victim-count threshold. The amendment provided for a four-level increase if an offense resulted in substantial financial hardship to five or more victims, and a six-level increase if an offense resulted in substantial financial hardship to 25 or more victims. *Id.* § 2B1.1 amend. 792. To trigger the highest available enhancement in 2018, the prosecution needed to prove substantial hardship to only 25 or more victims, so it highlighted only 32 of the over 600 victims who submitted impact statements. But based on the existence of the hundreds of others impacted, Rhame would likely have qualified for the six-level enhancement available under the 2014 manual. *See id.* § 2B1.1(b)(2)(C) (2014). Rhame cannot prove that he clearly would have been entitled to a lower sentencing range under the guidelines in effect at the time of his conduct. *See United States v. Elbeblawy*, 899 F.3d 925, 939 (11th Cir. 2018).

Rhame argues that our decision in *Maurya* dictates the opposite conclusion. 25 F.4th at 836. We disagree. In *Maurya*, we held that that the district court plainly erred when it applied the substantial-financial-hardship enhancement (added in 2015) to an offense that occurred in 2014. *Id.* Importantly, the government conceded the error. *Id.* And we ruled that the error affected the defendant's substantial rights. *Id.* Here, the government makes no such concession. Instead, it argues that Rhame cannot prove that he would have received a lower guidelines range under the 2014 manual. Rhame does not meaningfully argue otherwise. Instead, he asserts

that this conclusion is "incorrect" without explaining why. Under plain error review, the defendant must establish that any error was "clear or obvious" and affected "[his] substantial rights." *United States v. Ware*, 69 F.4th 830, 853 n.17 (11th Cir. 2023). Rhame's conclusory response falls short of satisfying this burden.

## IV. CONCLUSION

We **AFFIRM** the sellers' convictions. We also **AFFIRM** Rhame's sentence, except as to his appeal of the district court's refusal to grant a downward departure; we **DISMISS** that part of his appeal for lack of jurisdiction.